MORTON, SECRETARY OF THE INTERIOR *v.*
RUIZ ET UX.

No. 72–1052.   Argued November 5–6, 1973—
Decided February 20, 1974

200

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Harry R. Sachse* argued the cause for petitioner. With him on the brief were *Solicitor General Bork, Assistant Attorney General Johnson, Edmund B. Clark,* and *Carl Strass.*

*Winton D. Woods, Jr.,* argued the cause for respondents. With him on the brief was *Lindsay E. Brew.**

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents a narrow but important issue in the administration of the federal general assistance program for needy Indians:

Are general assistance benefits available only to those Indians living *on* reservations in the United States (or in areas regulated by the Bureau of Indian Affairs in Alaska and Oklahoma), and are they thus unavailable to Indians (outside Alaska and Oklahoma) living *off,* although near, a reservation?

The United States District Court for the District of Arizona answered this question favorably to petitioner, the Secretary of the Interior, when, without opinion and on cross-motions for summary judgment, it dismissed the respondents' complaint. The Court of Appeals, one judge dissenting, reversed. 462 F. 2d 818 (CA9 1972). We granted certiorari because of the significance of the

---

*\*Jerry C. Straus* filed a brief for the Arapahoe Tribe of Wyoming et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Lee J. Sclar* and *Bruce R. Greene* for the California Indian Legal Services, and by *David H. Getches* for the Native American Rights Fund.

issue and because of the vigorous assertion that the judgment of the Court of Appeals was inconsistent with long-established policy of the Secretary and of the Bureau.  411 U. S. 947 (1973).

I

The pertinent facts are agreed upon, although, as to some, the petitioner Secretary denies knowledge but does not dispute them.  App. 45–48.  The respondents, Ramon Ruiz and his wife, Anita, are Papago Indians and United States citizens.  In 1940 they left the Papago Reservation in Arizona [1] to seek employment 15 miles away at the Phelps-Dodge copper mines at Ajo.  Mr. Ruiz found work there, and they settled in a community at Ajo called the "Indian Village" and populated almost entirely by Papagos.[2]  Practically all the land and most of the homes in the Village are owned or rented by Phelps-Dodge.  The Ruizes have lived in Ajo continuously since 1940 and have been in their present residence since 1947.  A minor daughter lives with them.  They speak and understand the Papago language but only limited English.  Apart from Mr. Ruiz' employment with

---

[1] The Papago Indian Reservation was established by Executive Orders Nos. ·2300 and 2524, S. Doc. No. 53, 70th Cong., 1st Sess., 1008 and 1005, promulgated January 14, 1916, and February 1, 1917, respectively.  Later adjustments therein appear to have been effected by the Act of June 28, 1926, 44 Stat. 775; by the Act of Feb. 21, 1931, 46 Stat. 1202; by the Act of July 28, 1937, 50 Stat. 536, 25 U. S. C. §§ 463a–463c; and by the Act of June 13, 1939, 53 Stat. 819.  See also the Act of June 18, 1934, § 3, 48 Stat. 984; the Act of May 27, 1955, 69 Stat. 67; and 25 U. S. C. § 463. See *Papago Tribe* v. *United States*, 19 Ind. Cl. Comm'n 394, 433–434 (1968).

[2] Ajo is located within the borders of the Papago aboriginal tribal land.  The Indian Claims Commission has found that this land was taken from the Papagos by the United States.  *Id.*, at 422–423, 426.

Phelps-Dodge, they have not been assimilated into the dominant culture, and they appear to have maintained a close tie with the nearby reservation.[3]

---

[3] The following material in the record indicates the close ties retained by the Ajo Indians with the Papago Reservation:

"[M]any of the Papagos [in the Indian Village at Ajo] still maintain and frequently visit homes on the reservation. Many still have cattle there and some even farm there. During the summer many wives and children spend long periods of time living on the reservation. Many of the miners attend reservation dances and other ceremonies, driving to the reservation after work ends in the afternoon and returning early the next morning to Ajo. Some miners still vote in the district elections on the reservation and many seek medical care there. Through the years many of the miners who have either been fired or laid off have returned to the reservation. Thus even some of the most 'acculturated' Ajo Indians still maintain very close ties to the reservation. . . .

"During the prolonged strike of copper miners these ties were frequently strengthened and even extended. During this time of crisis, the members of the Indian Community often used the reservation as a place of refuge and occasionally as a source of food, money, and medical care." Affidavit of Larry R. Stucki, submitted in support of the respondents' motion for summary judgment. App. 84, 86–87.

As to the Ruizes in particular, it is said:

"[T]he whole family returned to South Komelik [on the reservation] during the whole month of August, 1967, and . . . they returned to South Komelik once or twice a month during the remainder of the strike, staying in Ajo only because one child, Mary Ann, was still attending school there.

"Ramon Ruiz . . . still maintained his home in South Komelik and . . . he planned to return there in 4 years when he retires. He had never thought of Ajo as being his real home. His poor command of the English language, in spite of having lived in Ajo for 28 years, tended to confirm this. His son did much of the talking and interpreted for his father frequently . . . . [W]hen the Ruiz[es'] other son was killed in military service in Viet Nam, funeral services were held by the family in the church in Sells [on the reservation].

". . . The siren song of the reservation, in most cases, prevents the complete severance of the umbilical cord to the homeland of these people." *Id.*, at 87.

In July 1967, 27 years after the Ruizes moved to Ajo, the mine where he worked was shut down by a strike. It remained closed until the following March. While the strike was in progress, Mr. Ruiz' sole income was a $15 per week striker's benefit paid by the union.[4]   He sought welfare assistance from the State of Arizona but this was denied because of the State's apparent policy that striking workers are not eligible for general assistance or emergency relief.[5]

On December 11, 1967, Mr. Ruiz applied for general assistance benefits from the Bureau of Indian Affairs (BIA).   He was immediately notified by letter that he was ineligible for general assistance because of the provision (in effect since 1952) in 66 Indian Affairs Manual 3.1.4 (1965) that eligibility is limited to Indians living "on reservations" and in jurisdictions under the BIA in Alaska and Oklahoma.[6]   An appeal to the Superintend-

---

[4] Mr. Ruiz so stated at the hearing referred to, *infra,* before the BIA Area Director. App. 11, 16. Mrs. Ruiz at the same hearing stated that she worked about eight hours a week for $1 an hour. App. 19.

[5] See Ariz. Rev. Stat. Ann. § 46–233.A.4 (Supp. 1971–1972) reflecting the amendment by Laws 1962, c. 117, § 23. See also *Graham* v. *Richardson,* 403 U. S. 365 (1971).

Striking workers, however, are eligible for the State's Surplus Commodities Distribution Program. Mr. Ruiz was certified under this program for two successive 90-day periods. App. 49–50.

[6] The Manual provides in pertinent part:

"3.1 *General Assistance.*

".1 *Purpose.* The purpose of the general assistance program is to provide necessary financial assistance to needy Indian families and persons living on reservations under the jurisdiction of this Bureau and in jurisdictions under the Bureau of Indian Affairs in Alaska and Oklahoma.

.      .      .      .      .

".4 *Eligibility Conditions.*

"A. *Residence.* Eligibility for general assistance is limited to

ent of the Papago Indian Agency was unsuccessful. A further appeal to the Phoenix Area Director of the BIA led to a hearing, but this, too, proved unsuccessful. The sole ground for the denial of general assistance benefits was that the Ruizes resided outside the boundaries of the Papago Reservation.

The respondents then instituted the present purported class action against the Secretary, claiming, as a matter of statutory interpretation, entitlement to the general assistance for which they had applied, and also challenging the eligibility provision as a violation of Fifth Amendment due process and of the Privileges and Immunities Clause of Art. IV, § 2, of the Constitution.

The Court of Appeals' reversal of the District Court's summary judgment for the Secretary was on the ground that the Manual's residency limitation was inconsistent with the broad language of the Snyder Act, 25 U. S. C. § 13, "that Congress intended general assistance benefits to be available to all Indians, including those in the position" of the Ruizes, 462 F. 2d, at 821, and that subsequent actions of Congress in appropriating funds for the BIA general assistance program did not serve to ratify the imposed limitation. The dissent took the position that the Secretary's policy was within the broad discretionary authority delegated to the Secretary by Congress with respect to the allocation of limited funds.

## II

The Snyder Act,[7] 42 Stat. 208, 25 U. S. C. § 13, approved November 2, 1921, provides the underlying con-

Indians living on reservations and in jurisdictions under the Bureau of Indian Affairs in Alaska and Oklahoma."

[7] The Snyder Act reads in full as follows:

"The Bureau of Indian Affairs, under the supervision of the Secretary of the Interior, shall direct, supervise, and expend such moneys

gressional authority for most BIA activities including, in particular and importantly, the general assistance program. Prior to the Act, there was no such general authorization. As a result, appropriation requests made by the House Committee on Indian Affairs were frequently stricken on the House floor by point-of-order objections. See H. R. Rep. No. 275, 67th Cong., 1st Sess. (1921); S. Rep. No. 294, 67th Cong., 1st Sess. (1921); 61 Cong. Rec. 4659–4672 (1921). The Snyder Act was designed to remedy this situation. It is comprehensively worded for the apparent purpose of avoiding these point-of-order motions to strike. Since the passage of the Act, the BIA has presented its budget requests without further interruption of that kind and Congress has enacted appropriation bills annually in response to the requests.

The appropriation legislation at issue here, Department

---

as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States for the following purposes:

"General support and civilization, including education.

"For relief of distress and conservation of health.

"For industrial assistance and advancement and general administration of Indian property.

"For extension, improvement, operation, and maintenance of existing Indian irrigation systems and for development of water supplies.

"For the enlargement, extension, improvement and repair of the buildings and grounds of existing plants and projects.

"For the employment of inspectors, supervisors, superintendents, clerks, field matrons, farmers, physicians, Indian police, Indian judges, and other employees.

"For the suppression of traffic in intoxicating liquor and deleterious drugs.

"For the purchase of horse-drawn and motor-propelled passenger-carrying vehicles for official use.

"And for general and incidental expenses in connection with the administration of Indian affairs."

of Interior and Related Agencies Appropriation Act, 1968, Pub. L. 90–28, 81 Stat. 59, 60 (1967), recited:

"BUREAU OF INDIAN AFFAIRS

"Education and Welfare Services

"For expenses necessary to provide education and welfare services for Indians, either directly or in cooperation with States and other organizations, including payment (in advance or from date of admission), of care, tuition, assistance, and other expenses of Indians in boarding homes, institutions, or schools; grants and other assistance to needy Indians; maintenance of law and order, and payment of rewards for information or evidence concerning violations of law on Indian reservations or lands; and operation of Indian arts and crafts shops; $126,478,000."

This wording, except for the amount, is identical to that employed in similar legislation for prior fiscal years [8] and, indeed, for subsequent ones.[9] It is to be noted that neither the language of the Snyder Act nor that of the Appropriations Act imposes any geographical limitation on the availability of general assistance benefits and does not prescribe eligibility requirements or the details of any program. Instead, the Snyder Act states that

[8] See, for example, the Appropriations Act for fiscal 1967, Pub. L. 89–435, 80 Stat. 170, 171 (1966); the Act for fiscal 1966, Pub. L. 89–52, 79 Stat. 174, 175 (1965); and the Act for fiscal 1965, Pub. L. 88–356, 78 Stat. 273, 274 (1964).

[9] See the Appropriations Act for fiscal 1969, Pub. L. 90–425, 82 Stat. 425, 427 (1968); the Act for fiscal 1970, Pub. L. 91–98, 83 Stat. 147, 148 (1969); the Act for fiscal 1971, Pub. L. 91–361, 84 Stat. 669, 670 (1970); the Act for fiscal 1972, Pub. L. 92–76, 85 Stat. 229, 230 (1971); the Act for fiscal 1973, Pub. L. 92–369, 86 Stat. 508, 509 (1972); and the Act for fiscal 1974, Pub. L. 93–120, 87 Stat. 429, 430–431 (1973).

the BIA (under the supervision of the Secretary) "shall direct, supervise, and expend . . . for the benefit, care, and assistance of the Indians throughout the United States" for the stated purposes including, as the two purposes first described, "[g]eneral support" and "relief of distress." This is broadly phrased material and obviously is intended to include all BIA activities.[10]

The general assistance program is designed by the BIA to provide direct financial aid to needy Indians where other channels of relief, federal, state, and tribal, are not available. Benefits generally are paid on a scale equivalent to the State's welfare payments. Any Indian, whether living on a reservation or elsewhere, may be eligible for benefits under the various social security programs in which his State participates and no limitation may be placed on social security benefits because of an Indian claimant's residence on a reservation.[11]

In the formal budget request submitted to Congress

---

[10] A critic of the Act (who also represented the Ruizes in the administrative proceedings) describes it as follows: "The Synder Act is a familiar and somewhat distressing occurrence in the history of Indian affairs. As in other instances, Congress enacted a very general measure and left the rest up to the Secretary of the Interior and the BIA. The result is that the structure of the welfare system is the BIA's own creation. The regulatory scheme is contained in the departmental manual which remains inaccessible except to a few social workers and persistent attorneys." Wolf, Needed: A System of Income Maintenance for Indians, 10 Ariz. L. Rev. 597, 607–608 (1968) (footnote omitted).

[11] See, for example, 42 U. S. C. § 1352 (b) (2). An Indian thus is entitled to social security and state welfare benefits equally with other citizens of the State. State ex rel. Williams v. Kamp, 106 Mont. 444, 449, 78 P. 2d 585, 587 (1938); U. S. Dept. of the Interior, Federal Indian Law 287, 516 (1958); Wolf, n. 10, supra, at 599.

by the BIA for fiscal 1968, the program was described as follows:

"General assistance will be provided to needy Indians on reservations who are not eligible for public assistance under the Social Security Act . . . and for whom such assistance is not available from established welfare agencies or through tribal resources." Hearings on Department of the Interior and Related Agencies Appropriations for 1968 before a Subcommittee of the House Committee on Appropriations, 90th Cong., 1st Sess., 777–778 (1967),[12] and Senate Hearings, Fiscal Year 1968, 90th Cong., 1st Sess., 695 (1967).[12a]

### III

We are confronted, therefore, with the issues whether the geographical limitation placed on general assistance eligibility by the BIA is consistent with congressional intent and the meaning of the applicable statutes, or, to phrase it somewhat differently, whether the congressional appropriations are properly limited by the BIA's restric-

---

[12] Hearings on the Department of the Interior and/or related agencies appropriations before subcommittees of the Senate or House Committee on Appropriations will be hereinafter merely identified as to branch of Congress, fiscal year, and number and session of Congress.

[12a] The hearings for the preceding four years disclose identically worded requests. House Hearings, Fiscal Year 1967, 89th Cong., 2d Sess., 255 (1966), and Senate Hearings, Fiscal Year 1967, 89th Cong., 2d Sess., 267 (1966); House Hearings, Fiscal Year 1966, 89th Cong., 1st Sess., 747–748 (1965), and Senate Hearings, Fiscal Year 1966, 89th Cong., 1st Sess., 653 (1965); House Hearings, Fiscal Year 1965, 88th Cong., 2d Sess., 775 (1964); Senate Hearings, Fiscal Year 1965, 88th Cong., 2d Sess., 148 (1964); House Hearings, Fiscal Year 1964, 88th Cong., 1st Sess., 844 (1963), and Senate Hearings, Fiscal Year 1964, 88th Cong., 1st Sess., 70 (1963).

tions, and, if so, whether the limitation withstands constitutional analysis.

On the initial question, the Secretary argues, first, that the Snyder Act is merely an enabling act with no definition of the scope of the general assistance program, that the Appropriation Act did not provide for off-reservation Indian welfare (other than in Oklahoma and Alaska), and that Congress did not intend to expand the program beyond that presented to it by the BIA request. Secondly, he points to the "on reservations" limitation in the Manual and suggests that Congress was well acquainted with that limitation,[13] and that, by legislating in the light of the Manual's limiting provision, its appropriation amounted to a ratification of the BIA's definitive practice. He notes that, in recent years, Congress has twice rejected proposals that clearly would have provided off-reservation general assistance for Indians.[14]

---

[13] The BIA's limitation in practice surfaced at many hearings. See, for example, the testimony of Assistant Commissioner Gifford in 1959:

"I believe the question comes up concerning Indians living off the reservation and who are in need not for these categories but for other types of assistance. In many cases the States and counties say that those Indians ought to be the responsibility of the Bureau of Indian Affairs; that they do not have sufficient funds to take care of them. We have *never* included in our request for welfare appropriations funds to take care of the needs of those Indians living *off the reservation.*" House Hearings, Fiscal Year 1960, 86th Cong., 1st Sess., 801 (1959) (emphasis supplied). See also Senate Hearings, Fiscal Year 1959, 85th Cong., 2d Sess., 291 (1958); Senate Hearings, Fiscal Year 1952, 82d Cong., 1st Sess., 372 (1951); Senate Hearings, Fiscal Year 1950, 81st Cong., 1st Sess., 592 (1949); Senate Hearings, Fiscal Year 1948, 80th Cong., 1st Sess., 598–599 (1947); Senate Hearings, Fiscal Year 1942, 77th Cong., 1st Sess., 160–162, 465–466 (1941).

[14] The bills referred to were H. R. 9621, 87th Cong., 2d Sess. (1962), and H. R. 6279, 88th Cong., 1st Sess. (1963). Each provided that benefits would be available to all Indians in certain

Thus, it is said, Congress has appropriated no funds for general assistance for off-reservation Indians and, as a practical matter, the Secretary is unable to provide such a program.

The Court of Appeals placed primary reliance on the Snyder Act's provision for assistance to "the Indians throughout" the United States. It concluded that the Act envisioned no geographical limitations on Indian programs and that, absent a clear congressional ratification of such a policy, the Secretary was powerless to shrink the coverage down to some lesser group of Indian beneficiaries.

Although we affirm the judgment of the Court of Appeals and its reversal of the judgment of the District Court, we reach its result on a narrower ground. We need not approach the issue in terms of whether Congress intended for *all* Indians, regardless of residence and of the degree of assimilation, to be covered by the general assistance program. We need only ascertain the intent of Congress with respect to those Indian claimants in the case before us. The question, so limited, is whether Congress intended to exclude from the general assistance program these respondents and their class, who are full-blooded, unassimilated Indians living in an Indian community near their native reservation, and who maintain close economic and social ties with that reservation. Except for formal residence outside the physical

named States, and that the Government would reimburse the State for a percentage of the latter's contribution under the several categorical assistance programs. The failure of these bills can be ascribed just as easily, of course, to the rather arbitrary selection of States, to the specific percentage designated, or to a reluctance to provide for all Indians (rural or urban, assimilated or nonassimilated), as to the increase over the lesser group then being serviced. See *United States* v. *Wise,* 370 U. S. 405, 411 (1962); *Order of Railway Conductors* v. *Swan,* 329 U. S. 520, 529 (1947).

boundaries of the Papago Reservation, the respondents, as has been conceded, meet all other requirements for the general assistance program.

## IV

There is, of course, some force in the Secretary's argument and in the facts that the BIA's budget requests consistently contained "on reservations" general assistance language and that there was testimony before successive appropriations subcommittees to the effect that assistance of this kind was customarily so restricted. Nonetheless, our examination of this and other material leads us to a conclusion contrary to that urged by the Secretary.

A. In actual practice, general assistance clearly has not been limited to reservation Indians. Indeed, the Manual's provision, see n. 6, *supra,* so heavily relied upon by the Secretary, itself provides that general assistance is available to nonreservation Indians in Alaska and Oklahoma. The rationale proffered for this is:

> "The situation of Indians in Alaska and Oklahoma has historically been unique. Much of Oklahoma was once set aside as an Indian Territory, and though most of the reservations have been abolished, there remains a large area of concentrated Indian population with tribal organization, living on land held in trust by the United States . . . . A similar situation of large concentrations of native Americans, with few reservations and substantial separate legislation prevails in Alaska . . . . The responsibilities of the Bureau of Indian Affairs in these jurisdictions are substantially similar to the Bureau's responsibilities on the reservations." Brief for Petitioner 21.

While this exception is not necessarily irrational, it

definitely demonstrates that the limitation in the budget requests is not rigidly followed by the BIA, inasmuch as most off-reservation Indians in the two named States are regarded as eligible for general assistance funds. If, as the Secretary urges, we are to assume that Congress has been aware of the Manual's provision, Congress was just as clearly on notice that the words "on reservations" did not possess their literal meaning in that context. Surely, some of the reasons for the Alaska-Oklahoma exception are equally applicable to Indians of the Ruiz class.

B. There was testimony in several of the hearings that the BIA, in fact, was not limiting general assistance to those within reservation boundaries and, on more than one occasion, Congress was notified that exceptions were being made where they were deemed appropriate. Notwithstanding the Manual, at least three categories of off-reservation Indians outside Alaska and Oklahoma have been treated as eligible for general assistance. The first is the Indian who relocates in the city through the BIA relocation program and who then is eligible for general assistance for the period of time required for him, under state law, to establish residence in the new location.[15] The second evidently is the Indian from the Turtle Mountain Reservation in North Dakota who lives on trust land near but apart from that reservation.[16] The third appears to be the Indian residing in Rapid City, South Dakota.[17]

[15] See, for example, Senate Hearings, Fiscal Year 1967, 89th Cong., 2d Sess., 302 (1966) (statement of Commissioner Nash); Senate Hearings, Fiscal Year 1959, 85th Cong., 2d Sess., 293 (1958) (statement of Deputy Commissioner Greenwood).

[16] House Hearings, Fiscal Year 1961, 86th Cong., 2d Sess., 508–510 (1960) (statement of Commissioner Emmons); Tr. of Oral Arg. 15.

[17] Senate Hearings, Fiscal Year 1967, 89th Cong., 2d Sess., 298–301 (1966).

In addition, although not controlling, it is not irrelevant that the "on reservations" limitation in the budget requests has never appeared in the final appropriation bills.

C. Even more important is the fact that, for many years, to and including the appropriation year at issue, the BIA itself made continual representations to the appropriations subcommittees that nonurban Indians living "near" a reservation were eligible for BIA services. Although, to be sure, several passages in the legislative history and the formal budget requests have defined eligibility in terms of Indians living "on reservations," the BIA, not infrequently, has indicated that living "on or near" a reservation equates with living "on" it.

An early example of this appears at the fiscal 1948 Senate Hearing. The following colloquy between Senator McCarran and Assistant Commissioner Zimmerman is one of the stronger statements made to Congress concerning the BIA's policy of limiting general assistance to reservation Indians and yet, within this very dialogue, relied on explicitly by the Secretary, is an indication that "on reservations" is not given a rigid interpretation:

"Senator McCarran. I have one question right there.

"Do these items address themselves to reservation Indians or nonreservation Indians, or both?

"Take, for instance, this welfare administration fund, $87,786. Is that given to reservation Indians, nonreservation Indians alike?

"Mr. Zimmerman. No, sir; it is not.

"Senator McCarran. To whom is it given?

"Mr. Zimmerman. This money goes to reservation Indians.

"Senator McCarran. Entirely?

"Mr. Zimmerman. Yes.

"Senator McCarran. Now, in my State, for instance, you have in the outskirts of Reno and again on the outskirts of Battle Mountain small Indian villages. Do they get anything in the way of relief?

"Mr. Zimmerman. Those town colonies are treated as reservations.

"Senator McCarran. You regard them as reservations?

"Mr. Zimmerman. Yes; some of them are.

"Senator McCarran. Is the colony outside of the city of Reno a reservation?

"Mr. Zimmerman. For certain purposes the courts have held that it is a reservation.

"Senator McCarran. Do they own the land?

"Mr. Zimmerman. Yes; the Federal Government owns the land.

"Senator McCarran. The Federal Government owns the land?

"Mr. Zimmerman. Yes, sir.

"Senator McCarran. They build their houses on it or the Federal Government?

"Mr. Zimmerman. They build their own houses.

"Senator McCarran. But those Indians do receive the benefits?

"Mr. Zimmerman. They would be eligible; yes, sir." Senate Hearings, Fiscal Year 1948, 80th Cong., 1st Sess., 598–599 (1947).

The interchangeability of "on" and "on or near" appears more directly in later years. In the relocation services section of the BIA's budget justification for fiscal 1959 it is stated:

"It is estimated that within the continental United States there are approximately 400,000 members of Indian tribes and bands. Of this number,

approximately 300,000 live *on or adjacent to* reservations for which the Bureau assumes some responsibility. On most of the Indian reservations there is a surplus of population in proportion to reservation resources. Opportunities for self-support on or near these reservations are wholly inadequate and the increasing surplus population is faced with the alternative of moving away from the reservation or remaining to live in privation or dependent, partially or wholly, upon some form of public assistance." Senate Hearings, Fiscal Year 1959, 85th Cong., 2d Sess., 288 (1958) (emphasis supplied).[18]

The relocation program is covered by the welfare appropriation. It is designed to provide short-term assistance to the needy Indian who leaves the reservation area and thereby disqualifies himself for the general assistance program. By describing the Indians who "live on or adjacent to reservations" as those entitled to relocation services when they depart, the BIA in effect was telling Congress that "moving away from the reservation" was a possibility even though the Indian lives only "adjacent to" the reservation, and it would seem to follow that the Indian living "adjacent to" the reservation was also eligible for general assistance.

At the fiscal 1962 hearing, Congressman Fenton inquired of Assistant Commissioner Gifford as to the Indian population in the United States. She replied:

"We have no absolute figure. Our best estimate of Indians on the reservations right now is about 375,000, I think. That is a figure we are using. Of course, there are Indians off of the reservations, and we do not have this count too clearly. How-

---

[18] Identical language, apart from the population figures, appeared in later BIA budget requests. See, for example, House Hearings, Fiscal Year 1962, 87th Cong., 1st Sess., 116 (1961).

ever, for those we consider our direct responsibility on the reservations——

"Mr. Fenton. To whom we contribute?

"Miss Gifford.  Yes we believe it is about 375,000."
House Hearings, Fiscal Year 1962, 87th Cong., 1st Sess., 205–206 (1961).

The foregoing statement by the Assistant Commissioner, of course, is not in itself particularly revealing on the issue that confronts us.  As can be seen from subsequent hearings, however, the stated figure includes Indians "on or near the reservations" and is not restricted to Indians who live "on."  Also, this "on or near" group, in contrast to those who live "off" the reservation, are within the group for whom the BIA assumed "direct responsibility."  Obviously, one can never be certain whether this expanded reading of "on" is the result of the BIA's desire, when seeking appropriations, to represent its jurisdiction and function somewhat more broadly than it actually was, or whether it reflects actual policy.

The "on or near" representations continued to be made to Congress.  At the fiscal 1963 House hearing, Congressmen questioned Commissioner Nash, Associate Commissioner Officer, and Assistant Commissioner Gifford as to the Indian population served by the BIA:

"Mr. Denton. How many Indians are there at the present time?

"Miss Gifford. You mean the total population?

"Mr. Denton. Yes.

"Miss Gifford. We estimate that the total population *on or near* the reservations that we serve is 380,000.

.        .        .        .        .

"Mr. Denton. I expect there is no way you could tell how many Indians there are *off* the reservations.

"Mr. Nash. Well, we can take the total census

figure for the Indian population and subtract those that are listed as living *on or near* the reservations, and this gives us a figure of 172,000 *off* the reservations; 380,000 *on or near* the reservations, including Alaska.

. . . . .

"Mr. Kirwan. What did you say was on the reservation?

"Mr. Nash. 380,000.

. . . . .

'"Mr. Officer. We are citing our figure of 380,000 to include those Indians *who live in the reservation vicinity* and are eligible to receive our services, as well as the Indians and other Alaska natives. The total of Alaska natives is 43,000. When we subtract that from 380,000, we have 337,000 Indians who live *on or near* reservations outside Alaska. Now if we are going to be concerned only with those who live on reservations, then we have that figure of 285,000, which was in our press release.

"Mr. Kirwan. We want to clear that up. The press release emphasizes the 285,000 on the reservation. Now we have the figure on the reservation and those who live near the reservation. That is the point we want to clear.

"Mr. Officer. The 380,000 are those who live *on or near* reservations plus the natives of Alaska.

"Mr. Denton. That does include Eskimos?

"Mr. Officer. Yes, sir.

"Mr. Denton. What do you do in places like Oklahoma, where the Indians live 'checkerboard'?

"Mr. Officer. It is for that reason that we cite figures of Indians living *on or near* reservations; because we have a number of situations similar to those in Oklahoma, where you don't have a well-

defined reservation boundary." House Hearings, Fiscal Year 1963, 87th Cong., 2d Sess., 352–354 (1962) (emphasis supplied).[19]

It is interesting to note that the Subcommittee was advised that Alaska and Oklahoma Indians are subsumed in the "on or near" category rather than placed in the pure "on" group, and, admittedly, they are entitled to general assistance. The figures stated also indicate that the number quoted the preceding year by Miss Gifford as the number "on the reservation" actually referred to those "on or near."

A nearly identical dialogue occurred in 1964 at the Senate Subcommittee:

"Senator Bible. How many Indians do you have under your jurisdiction?

"Mr. Nash. 380,000.

"Senator Bible. How many nonreservation Indians do you have? Are those just reservation Indians?

"Mr. Nash. These are *on or near.* This would not include, for example, Indians living in Los Angeles, San Francisco, Chicago, Denver, Minneapolis, unless they were brought there as part of our vocational training or relocation programs.

"Senator Bible. What is the total Indian population in the United States?

"Mr. Nash. The 1960 census counted 552,000 Indians, Eskimos, and Aleuts.

---

[19] The next year the Commissioner made the following statement as to the scope of the BIA service area:

"We have a need for services for 380,000 people. This includes those who are living directly on the reservations, and those who are living *very close,* so that the way in which they live affects reservations programs. They move back and forth, et cetera. We call this our 'Federal service to Indian population' and it is larger this year than last." House Hearings, Fiscal Year 1964, 88th Cong., 1st Sess., 889 (1963) (emphasis supplied).

"Chairman Hayden. Are these full-bloods or halfs?

"Mr. Nash. The census does not make an inquiry as to full or half. They merely say, 'Are you an Indian?' 'Are you known as an Eskimo?'

"Senator Bible. Following the Chairman's question, where does your jurisdiction rest in that regard? Do you have a measuring stick?

"Mr. Nash. No, sir. Our basis for providing services to an Indian is primarily on real estate. That is, we service those individuals who reside on trust or restricted land, *or so close to it* that the program of the reservation would be affected by services not performed for that person." Senate Hearings, Fiscal Year 1965, 88th Cong., 2d Sess., 227–228 (1964) (emphasis supplied).[20]

The now-familiar BIA representations appear again at the House hearing for fiscal 1967:

"Mr. Denton. How many Indians are there on the reservations and how many are under the Indian Bureau's supervision?

"Mr. Nash. We recognize what we call the Federal Indian Service population at 380,000.

"Mr. Denton. Are they on reservations?

"Mr. Nash. This is *on and near*. The figure *on* the reservation is somewhat smaller, but this is the figure which is of those who are on reservations, are living on trust lands, have titles which are alienated,

---

[20] In the formal budget presented for fiscal 1966 the Commissioner introduced his statement with the following representation:

"We are a modern service bureau, serving about 380,000 Indian persons and Alaska natives who live *on or near* reservations in 25 States. The services we perform are basically of three types." Senate Hearings, Fiscal Year 1966, 89th Cong., 1st Sess., 637 (1965) (emphasis supplied).

The third type there described consisted of welfare programs.

restricted against aliens, or are village communities in Alaska, Oklahoma, or are *so near to* reservations that they are dependent upon the facilities provided by the Bureau of Indian Affairs for their major community services.

> .     .     .     .     .

"Mr. Denton. What is the total Indian population?

"Mr. Nash. The 1960 census counted 552,000. It would be from there up, because there are a good many people who——

"Mr. Denton. And 380,000 are on the reservations, so about 170,000 are not under the Government's care.

"Mr. Nash. That is correct." House Hearings, Fiscal Year 1967, 89th Cong., 2d Sess., 370–371 (1966) (emphasis supplied).

At the hearing for fiscal 1968, the appropriation year directly at issue, Commissioner Bennett made like representations to the Senate Subcommittee. These could have led Congress to believe that there are only two relevant classes of Indians so far as non-land-related BIA services are concerned, those living "off" the reservation and those living "on or near":

> "Senator Bible. . . . Mr. Commissioner, and I am sorry because you may have covered this in earlier questioning, but what is the total Indian population under your jurisdiction at the present time?
>
> "Mr. Bennett. The total Indian population under our jurisdiction at the present time is 380,000. These are *on or near* reservations and comprise our service population based on the 1960 census.
>
> "Senator Bible. How many Indians do we have in the United States who are not under your jurisdiction and are not your responsibility?

"Mr. Bennett. Based on the 1960 census again the figure is about 170,000. These are people who moved away from the residential areas and generally have become a part of other communities." Senate Hearings, Fiscal Year 1968, 90th Cong., 1st Sess., 819 (1967) (emphasis supplied).[21]

Another recurring representation made by the BIA throughout the annual hearings is that whenever it was asked about those Indians who were outside the agency's service area, that is, "off" the reservations, the answer would refer to Indians who had left the reservations and moved to urban areas or who had attempted to be assimilated by the general population. Certainly, none of the references to those outside the service area seem appropriately applied to Indians of the Ruiz class.

During the fiscal 1950 Senate hearing, when the question arose as to the status of Indians who had left the reservation, Assistant Commissioner Zimmerman stated:

"Frankly, it has not been considered the obligation of the Indian Service in the years past to police Indians after they have established themselves in Phoenix or Flagstaff or Grand Forks, or wherever it

---

[21] The following year the Commissioner introduced his budget request with this statement:

"We are a modern service Bureau, serving as many as 400,000 Indians and Alaskan natives who live *on or near* reservations—people who find themselves isolated from the mainstream of American life—existing in poverty. In keeping with the general governmental policy of attacking the causes of poverty and the lack of salable skills, the objective of the Bureau of Indian Affairs is to coordinate Federal programs and programs of State and local agencies which will improve educational, economic, social and political opportunities of Indians." House Hearings, Fiscal Year 1969, 90th Cong., 2d Sess., 575 (1968); Senate Hearings, Fiscal Year 1969, 90th Cong., 2d Sess., 368 (1968) (emphasis supplied).

may be." Senate Hearings, Fiscal Year 1950, 81st Cong., 1st Sess., 483 (1949).

At the fiscal 1952 hearing, the following exchange between Senator Young and Commissioner Myer gives some indication of what Congress had in mind with respect to Indian beneficiaries "leaving the reservation":

"Senator Young. . . . Is it true that, if an Indian leaves North Dakota to go out to the State of Washington to work, and if he runs out of work and runs out of money out there, . . . he is eligible for relief only if he is back on the reservation?

"Mr. Myer. No. If he has established residence, he is as eligible as anyone. I do not know what the situation is in the State of Washington, but some States would require a 2-year residence; some do not.

"Senator Young. Why could not an Indian get relief back there as well as on the reservation?

"Mr. Myer. That presents a problem that is a matter of very basic policy. That is a matter of whether or not we are going to extend our services to Indians wherever they are and follow them around the United States as they leave the reservation with the type of service we are providing on the reservation." Senate Hearings, Fiscal Year 1952, 82d Cong., 1st Sess., 372 (1951).

The following representation by Acting Commissioner Crow to the House Subcommittee in 1961 seems to indicate that general assistance, although tied to residence, is concerned with those Indians who have not been assimilated:

"The Bureau provides services and assists the states in furnishing services to Indians in the United States, including the natives of Alaska, in the fields of human and natural resources. This includes

among other things programs of education, welfare, law and order, and the protection, development, and management of trust property. Services are, in general, limited to those arising out of our relationship regarding trust property and to those Indian people who reside on trust or restricted land. Funds are not included in these estimates for furnishing services to Indian people who have established themselves in the general society." House Hearings, Fiscal Year 1962, 87th Cong., 1st Sess., 98 (1961).

In the fiscal 1964 hearings, Commissioner Nash made the following statements indicating that "leaving the reservation" meant something far different from moving 15 miles to a nonurban Indian village while still maintaining close ties with the native reservation:

"The 1960 census showed 552,000 Indians, Eskimos and all others, all people defined as 'Indians' by the census. This would include those who have left reservations, gone to Los Angeles, San Francisco, Denver, Chicago, because they simply answered to the census taker, 'Yes, I am an Indian,' when they asked. We do not pretend to follow those people with services wherever they go.

". . . We have a need for services for 380,000 people. This includes those who are living directly on the reservations, and those who are living *very close*, so that the way in which they live affects reservations programs." House Hearings, Fiscal Year 1964, 88th Cong., 1st Sess., 889 (1963) (emphasis supplied).

See also Senate Hearings, Fiscal Year 1967, 89th Cong., 2d Sess., 295–300 (1966).

It apparently was not until 1971, four years after the appropriation for fiscal 1968, that anyone in Congress seriously questioned the BIA as to its precise policy con-

cerning the "off-on" dichotomy. The following dialogue between Senator Bible, long a member of the Senate Subcommittee, and Commissioner Bruce is instructive:

"Senator Bible. . . . What rule do you use to determine who is under your jurisdiction? Who is under the jurisdiction of the Bureau of Indian Affairs?

"Mr. Bruce. American Indians living on reservations, one-fourth degree blood or more living in the United States and Alaska.

"Senator Bible. One-fourth degree or more is one of the qualifications. They must also live on a reservation?

"Mr. Bruce. *On or near.*

"Senator Bible. What does the word 'near' mean?

"Mr. Bruce. It is very difficult to define. *Near reservation would be a nearby community.*

"Senator Bible. Well, half a mile, 1 mile, 5 miles, 100 yards? I am just trying to find out what your jurisdiction is. You have some responsibilities. Now what are you responsible for?

"Mr. Bruce. They vary and that is why it is difficult to answer specifically.

"Senator Bible. Well, give me the variables then. From 100 yards up to 10 miles?

"Is that defined in a statute anywhere? If I was to become the Commissioner of Indian Affairs, God forbid, how would I know who I had jurisdiction over? They must make some determination.

"Mr. Bruce. There is a definition for Oklahoma, and Alaska.

"Senator Bible. What do your lawyers tell you? . . . Can you go into the heart of Manhattan and find some Indian with one-fourth degree of Indian blood? Do you have jurisdiction over him in the heart of Manhattan?

"Mr. Bruce. No, sir; not over Manhattan.

"Senator Bible. Well, if not over Manhattan, how about New York State? How about Troy or Syracuse or Rochester?

.        .        .        .        .

"Senator Bible. . . . I am just trying to get the record straight to see what your responsibility is for Indians beyond the reservation. I think we are clear for the Indians on the reservation."

At this point a recess was taken and the Commissioner was instructed to present the Committee with a more precise breakdown. The dialogue continued:

"Senator Bible. Do you have a breakdown for the Indians on the reservations and the number beyond Indian reservations? Can you give me figures on that?

"Mr. Bruce. Yes.

"Senator Bible. All right. What are they?

"Mr. Bruce. 477,000 *on or near*.

"Senator Bible. 477,000 on or near, and we still don't know what near is . . . .

"Now on or near. Beyond the 477,000 Indians on reservations or near a reservation, you have no further jurisdiction over Indians?

"Mr. Bruce. That is right.

"Senator Bible. That is your total responsibility?

"Mr. Bruce. That is our total responsibility.[22]

_____

[22] The following additional information was supplied:
*"Population data*

"The statistical figure given for Indians living on and adjacent to reservations is based upon residence, and includes the following groups. The figures are for March 1970;

"(*a*) 306,900 Indians resident within Federal reservation boundaries, excluding Alaska and Oklahoma, which are discussed below.

"(*b*) 32,600 Indians resident nearby, who may receive services

"Senator Bible. Of the money that is in this budget, the $408 million, how much of that will be expended within the reservations and how much beyond the reservations?

"Mr. Bruce. Our total budget is to be spent for the benefit of reservation Indians.

"Senator Bible. You are still tripping me up on that on or near business. I wish you would define that."

[At this point there was an exchange as to whether BIA services extend to Indians living in Chicago and other urban areas.]

"Senator Bible. . . . Now how many urban Indians do we have?

"Mr. Bruce. We are talking about more than 250,000.

"Senator Bible. 250,000?

"Mr. Bruce. Yes.

"Senator Bible. That is over and above the 477,458?

"Mr. Bruce. That is right.

---

because of their proximity and mobility. For example, Indians working in nearby towns frequently maintain close contact with reservation people and affairs; they may visit the reservation or return temporarily or permanently. Other Indians live on public domain allotments outside the reservation boundaries. The distance of such places is not spelled out, but depends on the extent of contact. Distant members of the tribe are not counted, although they may be carried on the tribal roll or the tribal census. See also comments below on the Navajo area.

"(c) 81,200 Indians resident in former reservation areas of Oklahoma. (This includes Osage, which has some attributes of a reservation.)

"(d) 56,800 Alaska natives resident in Alaska. This includes Aleuts, and Eskimos as well as Indians." Senate Hearings, Fiscal Year 1972, 92d Cong., 1st Sess., 752–753 (1971).

See n. 3, *supra*.

"Senator Bible. And these are the difficulties that you have encountered in also a rather lengthy resume of some of the services that you perform for them as to your responsibility for the 250,000.

"Where do you find these 250,000 nonreservation Indians?

"Mr. Bruce. Living in urban cities—Los Angeles, San Francisco, Chicago, St. Louis, Cleveland, Denver, Minneapolis." Senate Hearings, Fiscal Year 1972, 92d Cong., 1st Sess., 751–756 (1971).[23]

Although most of these passages refer to the BIA's overall jurisdiction and not to the scope of the general assistance program, there is nothing to indicate that general assistance would not be made available for all within the service area. Unlike programs such as law enforcement and land projects, general assistance is not tied inherently or logically to the physical boundaries of the reservation. And programs, such as relocation, that explicitly extend beyond the reservation are not limited to "on or near." So it is difficult to ascertain precisely what relevance the "on or near" category would have if it did not relate to programs such as general assistance. Nowhere in the hearings had the BIA ever indicated which non-land-oriented programs are available to those "on" as opposed to those "on or near," and the only conclusion that is to be drawn from the representations

---

[23] Beginning with the fiscal 1973 hearings, there appeared a wide outpouring for BIA assistance for urban Indians. In the Appropriations Committee Report to the Senate for fiscal 1973, submitted by Senator Bible, the following language appears, indicating the Senate's earlier understanding that although the BIA program did not cover urban Indians, it did cover those "on or near" the reservations:

"The Committee directs that the Secretary prepare a plan to assure Bureau of Indian Affairs type services to all Indians in the United States—rather than just to those living 'on or near reservations.'" S. Rep. No. 92-921, p. 6 (1972).

to Congress is that those Indians who fit the "on or near" category are eligible for all BIA services not directly tied to the physical boundaries.

Thus, the usual practice of the BIA has been to represent to Congress that "on or near" is the equivalent of "on" for purposes of welfare service eligibility, and that the successive budget requests were for a universe of Indians living "on or near" and not just for those living directly "on." In addition, the BIA has continually treated persons "off" the reservations as not "on or near." In the light of this rather consistent legislative history, it is understandable that the Secretary now argues that general assistance has not been available to those "off" the reservation. We do not accept the argument, however, that the history indicates that general assistance was thereby restricted to those within the physical boundaries. To the contrary, that history clearly shows that Congress was led to believe that the programs were being made available to those unassimilated needy Indians living *near* the reservation as well as to those living "on." Certainly, a fair reading of the congressional proceedings up to and including the fiscal 1968 hearing can lead only to the conclusion that Indians situated near the reservation, such as the Ruizes, were covered by the authorization.[24]

[24] This conception as to the BIA's jurisdiction seems not to have been limited to Congress. Curiously enough, in the application, filed with this Court, for an extension of time within which to file the petition for certiorari in this case, the Solicitor General thus described the litigation:

"The court of appeals has held in this case that Indian welfare benefits administered by the Department of the Interior under the Snyder Act of 1921, 25 U. S. C. 13, must be provided not only to Indians living *on or near* reservations, as has been the practice of the Department of the Interior for many years, but must also be made available to Indians residing anywhere in the country" (emphasis supplied).

D. Wholly aside from this appropriation subcommittee legislative history, the Secretary suggests that Congress, each year since 1952, appropriated only in accord with the "on reservations" limitation contained in the BIA Manual. By legislating annually "in the light of [this] clear provision," the Secretary argues, Congress implicitly ratified the BIA policy. This argument, also, is not convincing. The limitation has not been published in the Federal Register or in the Code of Federal Regulations, and there is nothing in the legislative history to show, that the Manual's provision was brought to the subcommittees' attention, let alone to the entire Congress. To assume that Congress was aware of this provision, contained only in an internally circulated BIA document, would be most strained. But, even assuming that Congress was fully cognizant of the Manual's limitation when the 1958 appropriation was made, the language of geographic restriction in the Manual must be considered in conjunction with the representations consistently made. There is no reason to assume that Congress did not equate the "on reservations" language with the "on or near" category that continuously was described as the service area. In the light of the Manual's particular inclusion of Oklahoma and Alaska off-reservation Indians, it would seem that this interpretation of the provision would have been the logical one for anyone in Congress, who in fact was aware of it, to accept.

V

A. Having found that the congressional appropriation was intended to cover welfare services at least to those Indians residing "on or near" the reservation, it does not necessarily follow that the Secretary is without power to create reasonable classifications and eligibility requirements in order to allocate the limited funds available to him for this purpose. See *Dandridge* v. *Williams*,

397 U. S. 471 (1970); *Jefferson* v. *Hackney*, 406 U. S. 535
(1972). Thus, if there were only enough funds appro-
priated to provide meaningfully for 10,000 needy Indian
beneficiaries and the entire class of eligible beneficiaries
numbered 20,000, it would be incumbent upon the BIA
to develop an eligibility standard to deal with this prob-
lem, and the standard, if rational and proper, might
leave some of the class otherwise encompassed by the
appropriation without benefits. But in such a case the
agency must, at a minimum, let the standard be gen-
erally known so as to assure that it is being applied
consistently and so as to avoid both the reality and the
appearance of arbitrary denial of benefits to potential
beneficiaries.

Assuming, *arguendo*, that the Secretary rationally
could limit the "on or near" appropriation to include
only the smaller class of Indians who lived directly "on"
the reservation plus those in Alaska and Oklahoma, the
question that remains is whether this has been validly
accomplished. The power of an administrative agency
to administer a congressionally created and funded pro-
gram necessarily requires the formulation of policy and
the making of rules to fill any gap left, implicitly or
explicitly, by Congress. In the area of Indian affairs,
the Executive has long been empowered to promulgate
rules and policies,[25] and the power has been given ex-
plicitly to the Secretary and his delegates at the BIA.[26]

---

[25] "The President may prescribe such regulations as he may think
fit for carrying into effect the various provisions of any act relating
to Indian affairs, and for the settlement of the accounts of Indian
affairs." 25 U. S. C. § 9. This provision relates back to the Act
of June 30, 1834, § 17, 4 Stat. 738.

[26] "The Commissioner of Indian Affairs shall, under the direction
of the Secretary of the Interior, and agreeably to such regulations
as the President may prescribe, have the management of all Indian
affairs and of all matters arising out of Indian relations." 25 U. S. C.

This agency power to make rules that affect substantial individual rights and obligations carries with it the responsibility not only to remain consistent with the governing legislation, *FMC* v. *Seatrain Lines, Inc.,* 411 U. S. 726 (1973); *Dixon* v. *United States,* 381 U. S. 68, 74 (1965); *Brannan* v. *Stark,* 342 U. S. 451 (1952), but also to employ procedures that conform to the law. See *NLRB* v. *Wyman-Gordon Co.,* 394 U. S. 759, 764 (1969) (plurality opinion). No matter how rational or consistent with congressional intent a particular decision might be, the determination of eligibility cannot be made on an *ad hoc* basis by the dispenser of the funds.

The Administrative Procedure Act was adopted to provide, *inter alia,* that administrative policies affecting individual rights and obligations be promulgated pursuant to certain stated procedures so as to avoid the inherently arbitrary nature of unpublished *ad hoc* determinations. See generally S. Rep. No. 752, 79th Cong., 1st Sess., 12–13 (1945); H. R. Rep. No. 1980, 79th Cong., 2d Sess., 21–23 (1946). That Act states in pertinent part:

> "Each Agency shall separately state and currently publish in the Federal Register for the guidance of the public—
>
> .     .     .     .     .
>
> (D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general appli-

---

§ 2. This relates back to the Act of July 9, 1832, § 1, 4 Stat. 564. The Snyder Act provides:

"The Bureau of Indian Affairs, under the supervision of the Secretary of the Interior, shall direct, supervise, and expend such moneys as Congress may from time to time appropriate . . . ." 25 U. S. C. § 13.

cability formulated and adopted by the agency."
5 U. S. C. § 552 (a)(1).

The sanction added in 1967 by Pub. L. 90–23, 81 Stat. 54, provides:

"Except to the extent that a person has actual and timely. notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published." *Ibid.*[27]

In the instant case the BIA itself has recognized the necessity of formally publishing its substantive policies and has placed itself under the structure of the APA procedures. The 1968 introduction to the Manual reads:

*"Code of Federal Regulations:* Directives which relate to the public, including Indians, are published in the Federal Register and codified in 25 Code of Federal Regulations (25 CFR). These directives inform the public of privileges and benefits available; eligibility qualifications, requirements and procedures; and of appeal rights and procedures. They are published in accordance with rules and regulations issued by the Director of the Federal Register and the Administrative Procedure Act as amended. . . .

---

[27] The House report accompanying this provision stated:

"An added incentive for agencies to publish the necessary details about their official activities in the Federal Register is the provision that no person shall be 'adversely affected' by material required to be published—or incorporated by reference—in the Federal Register but not so published." H. R. Rep. No. 1497, 89th Cong., 2d Sess., 7 (1966). See S. Rep. No. 813, 89th Cong., 1st Sess., 6 (1965); S. Rep. No. 1219, 88th Cong., 2d Sess., 12 (1964).

> *"Bureau of Indian Affairs Manual:* Policies, pro-
> cedures, and instructions which do not relate to the
> public but are required to govern the operations of
> the Bureau are published in the Bureau of Indian
> Affairs Manual." 0 BIAM 1.2.

Unlike numerous other programs authorized by the
Snyder Act and funded by the annual appropriations,
the BIA has chosen not to publish its eligibility require-
ments for general assistance in the Federal Register or
in the CFR. This continues to the present time.[28] The

---

[28] Title 25 CFR (1973), on the subject of "Indians," contains
regulations and sets forth eligibility requirements for law-and-order
programs (pt. 11); care of Indian children in contract schools
(pt. 22); federal schools for Indians (pt. 31); administration of
educational loans, grants and other assistance for higher education
(pt. 32); enrollment of Indians in public schools (pt. 33); adminis-
tration of a program of vocational training for adult Indians
(pt. 34); and general credit to Indians (pt. 91). The only reference
to welfare activities is Subchapter D, entitled "Social Welfare" and
comprising pts. 21 and 22. Part 21 relates to the program under
which the Commissioner "may negotiate with State, territory, county
or other Federal welfare agencies for such agencies to provide welfare
services as contemplated" by 25 U. S. C. § 452. The regulations
state that the program applies to "Indians residing within a par-
ticular State within the exterior boundaries of Indian reservations
under the jurisdiction of the Bureau of Indian Affairs or on trust
or restricted lands under the jurisdiction of the Bureau of Indian
Affairs." 25 CFR § 21.1 (1973). But see 25 U, S. C. § 309 and 25
CFR § 34.3, where vocational training for adult Indians is also made
available "to additional Indians who reside *near* reservations in the
discretion of the Secretary of the Interior when the failure to pro-
vide the services would have a direct effect upon Bureau programs
within the reservation boundaries" (emphasis supplied). See also
25 CFR § 31.1.
The phrase "within the exterior boundaries of Indian reservations
under the jurisdiction of the Bureau of Indian Affairs," when read
in conjunction with the BIA's declared jurisdiction before Congress,
would seem to include Indians living "near" the reservations. In
any event, the cited regulations do not deal with the general

only official manifestation of this alleged policy of restricting general assistance to those directly on the reservations is the material in the Manual which is, by BIA's own admission, solely an internal-operations brochure intended to cover policies that "do not relate to the public." Indeed, at oral argument the Government conceded that for this to be a "real legislative rule," itself endowed with the force of law, it should be published in the Federal Register. Tr. of Oral Arg. 20.

Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required. *Service* v. *Dulles,* 354 U. S. 363, 388 (1957); *Vitarelli* v. *Seaton,* 359 U. S. 535, 539–540 (1959). The BIA, by its Manual, has declared that all directives that "inform the public of privileges and benefits available" and of "eligibility requirements" are among those to be published. The requirement that, in order to receive general assistance, an Indian must reside directly "on" a reservation is clearly an important substantive policy that fits within this class of directives. Before the BIA may extinguish the entitlement of these otherwise eligible beneficiaries, it must comply, at a minimum, with its own internal procedures.

The Secretary has presented no reason why the requirements of the Administrative Procedure Act could not or should not have been met. Cf. *SEC* v. *Chenery Corp.,* 332 U. S. 194, 202 (1947). The BIA itself has not attempted to defend its rule as a valid exercise of its "legislative power," but rather depends on the argument that Congress itself has not appropriated funds for

---

assistance program. There is nothing in the Code indicating that a general assistance program exists, to say nothing of the absence of eligibility criteria.

Indians not directly on the reservations. The conscious choice of the Secretary not to treat this extremely significant eligibility requirement, affecting rights of needy Indians, as a legislative-type rule, renders it ineffective so far as extinguishing rights of those otherwise within the class of beneficiaries contemplated by Congress is concerned.

The overriding duty of our Federal Government to deal fairly with Indians wherever located has been recognized by this Court on many occasions. See, e. g., *Seminole Nation* v. *United States,* 316 U. S. 286, 296 (1942); *Board of County Comm'rs* v. *Seber,* 318 U. S. 705 (1943). Particularly here, where the BIA has continually represented to Congress, when seeking funds, that Indians living near reservations are within the service area, it is essential that the legitimate expectation of these needy Indians not be extinguished by what amounts to an unpublished *ad hoc* determination of the agency that was not promulgated in accordance with its own procedures, to say nothing of those of the Administrative Procedure Act. The denial of benefits to these respondents under such circumstances is inconsistent with "the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people." *Seminole Nation* v. *United States,* 316 U. S., at 296; see *Squire* v. *Capoeman,* 351 U. S. 1 (1956). Before benefits may be denied to these otherwise entitled Indians, the BIA must first promulgate eligibility requirements according to established procedures.

B. Even assuming the lack of binding effect of the BIA policy, the Secretary argues that the residential restriction in the Manual is a longstanding interpretation of the Snyder Act by the agency best suited to do this, and that deference is due its interpretation. See *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 433–434 (1971).

The thrust of this argument is not that the regulation itself has created the "on" and "near" distinction, but that Congress has intended to provide general assistance only to those directly on reservations, and that the Manual's provision is simply an interpretation of congressional intent. As we have already noted, however, the BIA, through its own practices and representations, has led Congress to believe that these appropriations covered Indians "on or near" the reservations, and it is too late now to argue that the words "on reservations" in the Manual mean something different from "on or near" when, in fact, the two have been continuously equated by the BIA to Congress.

We have recognized previously that the weight of an administrative interpretation will depend, among other things, upon "its consistency with earlier and later pronouncements" of an agency. *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 140 (1944). See generally 1 K. Davis, Administrative Law Treatise §§ 5.03–5.06 (1958 ed. and Supp. 1970). In this instance the BIA's somewhat inconsistent posture belies its present assertion. In order for an agency interpretation to be granted deference, it must be consistent with the congressional purpose. *Espinoza* v. *Farah Mfg. Co.,* 414 U. S. 86 (1973); *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 381 (1969). It is evident to us that Congress did not itself intend to limit its authorization to only those Indians directly on, in contrast to those "near," the reservation, and that, therefore, the BIA's interpretation must fail.

We emphasize that our holding does not, as was suggested at oral argument, Tr. of Oral Arg. 3, 5, and in the Brief for Petitioner 2, make general assistance available to all Indians "throughout the country." Even respondents do not claim this much. Brief for Respondents 23;

Tr. of Oral Arg. 28. The appropriation, as we see it, was for Indians "on or near" the reservation. This is broad enough, we hold, to include the Ruizes who live where they found employment in an Indian community only a few miles from their reservation, who maintain their close economic and social ties with that reservation, and who are unassimilated. The parameter of their class will be determined, to the extent necessary, by the District Court on remand of the case. Whether other persons qualify for general assistance will be left to cases that arise in the future.

In view of our disposition of the statutory issue, we do not reach the respondents' constitutional arguments. We intimate no views as to them.

The judgment of the Court of Appeals is affirmed and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*