915 F.2d 1482
 GEORGIA DEPARTMENT OF HUMAN RESOURCES, Georgia Department of
Human Resources, Division of Vocational
Rehabilitation, Plaintiffs-Appellants,
Lauro F. Cavazos, Secretary of Education, et al.,
Defendants-Appellants,
v.
Jessie C. NASH, Defendant-Appellee,
National Federation of the Blind, Intervenor.
 No. 88-8120.
 United States Court of Appeals,
Eleventh Circuit.
 Oct. 30, 1990.
 
 William M. Droze, Asst. Atty. Gen., Atlanta, Ga., for state.
 William J. Cole, U.S. Dept. of Justice, Washington, D.C., for U.S.
 Stroud P. Stacy, Atlanta, Ga., for Nash.
 Peggy Pinder, Grinnell, Iowa, for intervenor--National Federation of the Blind.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before TJOFLAT, Chief Judge, CLARK, Circuit Judge, and RYSKAMP*, District Judge.
 TJOFLAT, Chief Judge:
 
 
 1
 This case involves an issue of statutory interpretation under the Randolph-Sheppard Vending Stand Act (Act). The district court below interpreted the statute to provide a blind vendor with an action for damages against a State licensing agency based on that agency's failure to complain when a federal entity closed a vending stand located on property under its control. Following that interpretation, the district court upheld an award of compensatory damages to the blind vendor made by an arbitration panel convened under the Act. The State licensing agency appeals this decision. We hold that the district court has misinterpreted the statute and therefore reverse its decision.
 
 I.
 
 2
 Congress enacted the Randolph-Sheppard Vending Stand Act in 1936 to "provid[e] blind persons with remunerative employment, enlarg[e] the economic opportunities of the blind, and stimulat[e] the blind to greater efforts in striving to make themselves self-supporting." Ch. 638, 49 Stat. 1559, 1559 (1936) (codified at 20 U.S.C. Sec. 107(a) (1982)). The Act authorized blind persons "to operate vending facilities in any Federal building." Id. As amended in 1954 and 1974, the Act requires that "departments, agencies, or instrumentalities of the United States" managing federal property make available space for a vending facility and give priority in operating those facilities to licensed blind persons. 20 U.S.C. Sec. 107(b) (1982).[1]
 
 
 3
 Under section 107(b), the Secretary of Education must "prescribe regulations designed to assure that ... the priority ... is given." The regulations now in effect require the managers of federal property to make vending facilities available to blind vendors "wherever feasible, in light of appropriate space and potential patronage." 34 C.F.R. Sec. 395.30(a) (1988). The Act also establishes procedures for placing blind vendors in such facilities: the Secretary designates state agencies to license and train blind vendors; once the state agency licenses vendors, they become eligible for employment at available vending facilities. See 20 U.S.C. Secs. 107a, 107b; see also 34 C.F.R. 395.2-.7, .11. In addition, federal property managers establish new vending facilities and contact the state agencies to run them. The agencies then assign licensed blind vendors to these new locations. See 20 U.S.C. Sec. 107a; 34 C.F.R. Secs. 395.7, .16. The vendors remain licensees of the state and earn income from the facilities' profits.
 
 
 4
 The Act provides a set of remedial procedures in section 107d-1.[2] Under section 107d-1(a), a blind licensee "who is dissatisfied with any action arising from the operation or administration of the vending facility program" is entitled to "a full evidentiary hearing" before the state agency. 20 U.S.C. Sec. 107d-1(a). If the blind licensee remains "dissatisfied with any action taken or decision rendered as a result of such hearing," then the licensee may file a complaint with the Secretary who must convene a panel to arbitrate the dispute. Id. The section thus guarantees the blind licensee a full evidentiary hearing and an arbitration proceeding if the licensee is "dissatisfied" (for any reason) with "any action arising from the operation or administration" of the program.[3] This guarantee, however, applies only to grievances concerning actions by state licensing agencies.[4] Section 107d-1(a) provides no direct grievance procedure for a vendor who is dissatisfied with action by a federal entity.
 
 
 5
 Instead, section 107d-1(b) gives the "State licensing agency" (and not the blind licensee)[5] a right to complain when a case involves action by "any department, agency, or instrumentality of the United States that has control of the maintenance, operation, and protection of Federal property"--such as the United States Marine Corps in the present case. See 20 U.S.C. Sec. 107d-1(b). Under this provision, "[w]henever" the State licensing agency determines that the federal entity at issue "is failing to comply with the provisions of this chapter or any regulations issued thereunder," the state agency "may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute." Id. (emphasis added).
 
 
 6
 The present case involves an issue of interpretation under this statute. The blind vendor involved in this case has attempted to fashion a cause of action under the statute that would provide her with compensatory damages against the state agency based on that agency's failure to complain about action by a federal entity.[6] Both the arbitration panel convened by the Secretary under section 107d-1(a) and the district court have, under two different interpretations of the statute, allowed the vendor to proceed. We hold that this cause of action is inconsistent both with the Act's express language and its remedial structure. After presenting the case's facts and procedural history, we discuss the cause of action.
 
 II.
 
 7
 In October 1973, the United States Marine Corps contacted the Georgia Department of Human Resources (GDHR)[7]--the state licensing agency designated to administer Georgia's vending facility program--about placing blind vendors on a Marine base in Albany, Georgia. The Marines and the GDHR arranged for blind vendors licensed through the GDHR to operate four vending facilities on the base. The GDHR gave one of the facilities to a blind woman named Jessie C. Nash, who had applied to participate in the GDHR's vending facility program. In September 1975, the GDHR requested the Marines to terminate the license for the facility because of continuing financial losses. The Marines agreed to do so. The following summer, Nash was reassigned to another vending facility on the base. As Nash was informed, however, this assignment was only temporary: the Marines wanted to include the facility in a package deal with a single contractor who would provide hot-food services on the entire base.
 
 
 8
 In the fall of 1976, the Marines officially began their search for a single hot-food-service contractor and informed the GDHR that the package would in fact include Nash's facility. The GDHR indicated that it wanted to retain Nash's facility although it did not want to bid for the hot-food contract. In January 1977, the Marines notified the GDHR of their decision to award the hot-food contract to a private firm and gave notice of their intention to close the remaining vending facilities on the base, including Nash's.
 
 
 9
 Following termination of her facility, Nash took action under the Act and requested a hearing before the GDHR pursuant to section 107d-1(a).[8] The GDHR's hearing officer, however, dismissed Nash's request for a hearing. He held that the GDHR lacked jurisdiction over the Marines and thus could not provide Nash with the relief she sought--an order requiring the Marines to cancel their contract with the private food contractor and reinstate Nash's facility.
 
 
 10
 Pursuant to section 107d-1(a), Nash filed a complaint with the Secretary in May 1977, requesting him to convene a panel to arbitrate the dispute. In August, the Secretary informed Nash that, because the GDHR had not provided Nash an evidentiary hearing, the Secretary could not convene an arbitration panel. Instead, the Secretary required the GDHR to hold an evidentiary hearing and address whatever issues were within its jurisdiction.
 
 
 11
 A few months later, the GDHR held the hearing. At the hearing, Nash argued that the GDHR had a duty under section 107d-1(b) to protest the Marines' decision to eliminate the blind vending facilities on the base. In October 1977, the hearing officer again dismissed Nash's claim for relief, holding that the GDHR had committed no violation in failing to file a complaint against the Marines under section 107d-1(b).
 
 
 12
 In December 1977, Nash filed a second complaint with the Secretary pursuant to section 107d-1(a), naming the Department of Defense as a defendant as well. The Secretary dismissed the Department of Defense and finally convened an arbitration panel, which held hearings in October and December of 1979. The panel issued its decision in June 1980: it held that the GDHR had violated section 107d-1(b) of the Act by not filing a complaint with the Secretary on Nash's behalf and declared that Nash was entitled to damages in the form of back pay.
 
 
 13
 The GDHR brought an action in the district court against the Secretary[9] and Nash seeking judicial review of the panel's decision pursuant to section 107d-2(a) and the Administrative Procedure Act (APA), 5 U.S.C. Secs. 701-06 (1988). On review, the district court held that section 107d-1(b) "requires the agency to pursue a licensed blind vendor's grievance when his rights are arguably being jeopardized by the Federal agency's actions." See Georgia Dep't of Human Resources v. Bell, 528 F.Supp. 17, 24 (N.D.Ga.1981).[10] The district court thus affirmed the arbitration panel's decision and remanded the case to the panel for a determination of the damages amount. The court also retained jurisdiction to enforce the award. In an order dated April 16, 1982, the court subsequently amended its holding. Striking out the above-quoted passage, the court instead stated that "section 107d-1(b) gives the state licensing agency discretion to determine whether to file a complaint with the Secretary." "Nevertheless," the court concluded (without discussion), "the state licensing agency abused its discretion in failing to file a complaint with the Secretary pursuant to section 107d-1(b)." On remand to the arbitration panel, the panel awarded Nash $35,997.84 in back pay and interest.
 
 
 14
 In July 1986, Nash moved the district court to enforce the panel's award. Both the GDHR and the Secretary opposed the motion on the grounds that the eleventh amendment[11] prohibited an award of retroactive damages against the GDHR. The district court rejected the eleventh amendment arguments and issued an order on December 23, 1987, granting Nash's motion to enforce the panel's award.[12]
 
 
 15
 Both the GDHR and the Secretary[13] appeal this decision. They challenge it on eleventh amendment grounds.[14] Nash contends that the district court properly decided the eleventh amendment issue and asks us to uphold the damages award. We do not reach the eleventh amendment issue, however. In our view, the Act supports no action for damages by a blind vendor against a state licensing agency for failure to complain about a federal entity's action. Such an action would require an arbitration panel convened under section 107d-1(a) to conduct an analysis that is entirely beyond its capacity: it would have to determine (1) whether an arbitration panel convened under section 107d-1(b) would have found the federal entity to be in violation of the Act and ruled in favor of the state agency; (2) whether the federal entity would have complied with the section 107d-1(b) panel's ruling; and (3) if not, whether an article III judge would have ordered the federal entity to do so. Because Congress clearly did not intend the Act to support such a cause of action, we reject the district court's interpretation.
 
 
 16
 In part III, we first analyze the language of section 107d-1 to determine what remedies the Act expressly provides. In section A, we then analyze section 107d-1(a) and conclude that it provides blind vendors with no substantive right to challenge a state agency's failure to file a complaint against a federal entity for noncompliance with the Act. In section B, we reach the same conclusion with respect to section 107d-1(b). Finally, in section C, we demonstrate that the district court's interpretation is inconsistent with the Act's remedial structure, and that if upheld, it would force the arbitration panel in a section 107d-1(a) case to conduct an analysis totally beyond its capabilities. We therefore conclude in part IV that the district court's decision must be reversed.
 
 III.
 
 17
 Section 107d-1 contains the remedial provisions available under the Act.[15] Subsection (a) provides a grievance procedure for blind vendors who are "dissatisfied with any action arising from the operation or administration of the vending facility program." Under this procedure, the vendor first submits a request to the state licensing agency for a full evidentiary hearing, which the section mandates the agency to provide. If the vendor remains dissatisfied with the state licensing agency's decision, the vendor may file a complaint with the Secretary, who must then convene a panel to arbitrate the dispute. The arbitration panel's decision is "final and binding on the parties" but subject to appeal in accordance with section 706 of the APA, 5 U.S.C. Sec. 706. See 20 U.S.C. Sec. 107d-2(a). Thus, subsection (a) guarantees that a blind vendor with a grievance receives a full evidentiary hearing and, if the vendor desires, submission of the dispute to an arbitration panel.
 
 
 18
 The blind vendor may use these procedures, however, only for grievances concerning actions by a state licensing agency. The section does not apply when the action at issue was taken by a federal entity. The provision's language itself expresses this limitation: it applies to actions "arising from the operation or administration of the vending facility program."[16] Under the Act, the state licensing agency assumes responsibility for operating and administering the vending facility program as a whole. See 20 U.S.C. Sec. 107b. Federal entities are not involved in the "operation or administration" of the program on that level; rather, the federal entities control given pieces of property on which vending stands are located. The section, therefore, provides blind vendors with a procedure for bringing grievances only against state licensing agencies concerning actions by those agencies. The section provides blind vendors with no grievance procedures directly against federal entities concerning actions by those entities nor with any such procedures against state licensing agencies concerning actions by federal entities.[17]
 
 
 19
 Subsection (b) describes the procedures available to redress a federal entity's noncompliance with the Act: the state licensing agency, "[w]henever [it] determines that any department, agency, or instrumentality of the United States that has control of the maintenance, operation, and protection of Federal property is failing to comply with the [Act,] ... may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute." Id. Sec. 107d-1(b). The Act thus authorizes only the state licensing agencies, and not the vendors themselves, to bring complaints against federal entities. The section, moreover, leaves exercise of this power to the state agencies' discretion: the agencies "may file [ ] complaint[s]." (Emphasis added.)According to the district court's interpretation of these two subsections, a blind vendor can bring a grievance under subsection (a) against a state agency based on that agency's failure to file a complaint against a federal entity under subsection (b). If the state agency has abused its discretion in not filing a complaint under subsection (b), then, in the district court's view, the arbitration panel convened under subsection (a) can order the state agency to pay the blind vendor compensatory damages. Based on this interpretation, the district court in the present case upheld the arbitration panel's award of back pay to Nash. We reject this interpretation of the Act, however, and reverse the district court's decision. In our view, the statute supports no such cause of action. Although subsection (a) entitles the vendor to process a grievance under the available procedures, subsection (b) gives the vendor no substantive right that would support an award of damages under subsection (a). Thus, while Nash is entitled to process her complaint pursuant to subsection (a), she is entitled to no additional remedy under subsection (b). As we discuss in section C, such a cause of action would require an arbitration panel in a subsection (a) case to conduct a set of inquiries that would be entirely beyond its capacity and inconsistent with the structure of the Act. Before reaching that conclusion, we analyze in sections A and B the remedies that the Act actually provides.
 
 A.
 
 20
 On its face, subsection (a) is quite broad:[18] it allows a vendor to submit a grievance to a state agency concerning "any action arising from the operation or administration of the vending facility program." (Emphasis added.) A state agency's failure to complain under subsection (b) would undoubtedly constitute such an "action" for purposes of subsection (a). A vendor could therefore invoke the subsection's grievance procedures: he could submit his grievance to the state agency, obtain a full evidentiary hearing, and then, if he desired, have the dispute arbitrated. Although subsection (a) entitles the vendor to invoke these procedures, however, it grants the blind vendor no substantive entitlement to any remedies. The source of such a substantive entitlement must come from some other provision, such as from subsection (b) according to the district court's interpretation of the Act in the present case. That is, in the district court's view, subsection (b) gives the blind vendor a substantive right to have the state licensing agency properly exercise its discretion to file complaints with the Secretary.
 
 
 21
 Under this interpretation, any abuse of discretion by the agency--i.e., the agency's improper decision not to file a complaint--would violate the blind vendor's substantive right and entitle him to damages in a subsection (a) proceeding against the state agency. Of course, if subsection (b) provides the blind vendor no such entitlement (or even if it did, but the state agency had not abused its discretion), then the vendor would have no right to damages in a grievance procedure under subsection (a). Subsection (a)'s broad language would still entitle the vendor to invoke the remedial procedures provided in that subsection but only in order to exercise his procedural right to complain. Although this procedural right gives the vendor no substantive remedy, the right is not entirely empty. It guarantees the vendor an opportunity to convince the state agency to take action--to file a complaint pursuant to subsection (b)--even though the agency has discretion not to act. In our view, only this procedural guarantee is available to the blind vendor in the present case. Subsection (b) provides the vendor no substantive right: the state agency's discretion under that subsection is complete.
 
 B.
 
 22
 Section 107d-1(b) gives the state agency complete discretion both to determine that a federal entity is not complying with the Act and to file a complaint in the case of noncompliance. The subsection stipulates no procedures or substantive rules to govern either of these determinations by the state agency. Nor do any other provisions of the Act or its regulations impose any such procedures or rules.[19] The district court, however, would interpret the section as providing blind vendors with a substantive right to challenge a state agency's failure to file a complaint as an abuse of the agency's discretion.[20] Because neither the Act, its regulations, nor any other source of law, at least in the present case,[21] imposes any procedural or substantive limits on a state agency's decision whether or not to file a complaint under subsection (b), the state agency has complete discretion to complain or not, and its action is unreviewable under an abuse-of-discretion standard.
 
 
 23
 We first consider the language of subsection (b) itself:
 
 
 24
 Whenever any State licensing agency determines that any department, agency, or instrumentality of the United States that has control of the maintenance, operation, and protection of Federal property is failing to comply with the provisions of this chapter or any regulations issued thereunder ... such licensing agency may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute....
 
 
 25
 (Emphasis added.) As the language makes clear, the state licensing agency must make an initial determination that a federal entity "is failing to comply" with the Act. Once the state agency has made that determination, it can invoke the procedures outlined in the section and file a complaint with the Secretary. The section thus requires an exercise of discretion by the state agency at two points: in making the initial determination and in deciding whether to file the complaint.
 
 
 26
 In a case such as the present one, where the state agency has made no initial determination that the federal entity has failed to comply with the Act, the blind vendor would first have to prove that the state agency abused its discretion in not making that determination. Without this preliminary showing, the subsection would not apply even if it did entitle the vendor to challenge the state agency's failure to file the complaint. The subsection, however, says nothing about what procedures the state agency should follow in determining that the federal entity is not complying with the Act. The section, moreover, contains no indication that the state agency has any obligation to make such a determination at all. Indeed, the subsection's language expressly places these issues beyond its scope: by its own terms the subsection comes into play "[w]henever" that determination has or has not already been made. In our view, the absence of any prescribed procedures or standards governing the state agency's preliminary determination prevents the application of an abuse-of-discretion standard to that decision.[22]
 
 
 27
 Even if a state agency had determined that a federal entity was failing to comply with the Act, and then decided not to file a complaint, the same problems would arise in trying to impose an abuse-of-discretion standard on the agency's second-stage decision not to complain. The subsection provides no standards for evaluating whether a state agency has abused its discretion in deciding not to file a complaint with the Secretary. On its face, moreover, the subsection suggests that the state agency's discretion is quite broad: it allows the state agency not to file a complaint even if the agency has determined that the federal entity at issue has failed to comply with the Act ("such licensing agency may file a complaint"). To say that state agencies have abused their discretion by not filing complaints whenever federal entities fail to comply with the Act would therefore be inconsistent with the provision's plain language. Furthermore, no other provisions of the Act, of its regulations, or (in the present case) of any state regulations impose any substantive or procedural requirements on the state agencies' decision. We therefore see no legal basis for imposing any of our own and hold that the state agency has complete discretion in deciding whether or not to file a complaint with the Secretary. Because the Act gives complete discretion to the state agency, it provides the vendor with no right (beyond the procedures available under subsection (a)) to challenge the state agency's decision in a given case not to file a subsection (b) complaint.
 
 C.
 
 28
 In addition, interpreting subsection (b) to provide a blind vendor with a substantive right enforceable against a state agency in a subsection (a) grievance procedure would be inconsistent with the structure of the Act's remedial provisions. The cause of action would require the subsection (a) panel to predict the decision of a hypothetical subsection (b) panel. It would also require the subsection (a) panel to conduct a hypothetical judicial review of the subsection (b) panel's decision. In that capacity, the subsection (a) panel would have to predict the decision of a district court reviewing the subsection (b) panel's decision under the APA. In addition, the subsection (a) panel would have to determine whether the subsection (b) panel's decision would be enforceable against the federal entity at issue. Not only would this inquiry force the subsection (a) panel well beyond its capabilities, it would also require resolution of difficult issues of statutory interpretation that the courts have yet to address. Based on this discussion, we conclude that Congress could not have intended to provide such a cause of action.
 
 
 29
 We first briefly reconsider section 107d-1. The two sets of procedures provided by that section are similar, but different; and these differences prevent a subsection (a) panel from competently evaluating a subsection (b) panel's decision. We then discuss the hypothetical judicial review that the subsection (a) panel would have to conduct and its inability to do so. We conclude that Congress could not have intended to provide a cause of action with such extreme implications on the Act's general remedial structure.
 
 1.
 
 30
 As we describe above, section 107d-1 sets out a dual scheme of remedies. Subsection (a) gives the blind licensee a direct action against the state licensing agency. Subsection (b), however, gives the blind licensee nothing; rather, it gives the state agency authority to bring a complaint against a federal entity controlling property on which vending facilities are located. The procedures proscribed by these two subsections are similar, but different, and these differences undermine the cause of action at issue here.
 
 
 31
 Subsection (a) requires the state agency to provide a full evidentiary hearing and then requires the Secretary to convene a panel to arbitrate the dispute if the vendor remains dissatisfied after the hearing. Subsection (b) allows the state agency to file a complaint with the Secretary and then requires the Secretary to convene a panel to arbitrate the dispute. Thus, both subsections eventually arrive at the same procedural stage--arbitration in accordance with section 107d-2.[23]
 
 
 32
 Section 107d-2, however, distinguishes between arbitration under these two subsections. To begin with, the arbitration panels' compositions differ in the two cases. In subsection (a) cases, which section 107d-2 refers to as "grievances of blind licensees," the panel consists of three individuals: one designated by the state agency, one by the blind licensee, and a third designated jointly by the first two individuals. In contrast, in subsection (b) cases, which the section refers to as "complaints filed by a state licensing agency," the panel consists of an individual designated by the state licensing agency, another designated by the federal entity at issue, and a third designated jointly by the first two individuals. Thus, the make-up of the panels in both categories of cases represents the interests of the parties involved in the dispute. Because the parties involved in a subsection (a) dispute differ from those in a subsection (b) dispute, however, the panels in the two categories of cases will represent different, and not at all compatible, interests. Whereas the subsection (a) panel will mediate between the blind vendor's and state agency's interests, the subsection (b) panel will mediate between the state agency's and the federal entity's interests. The blind vendor is not represented on the subsection (b) panel, and the federal entity is not represented on the subsection (a) panel. Moreover, even though the state agency is represented on both types of panels, its interests differ in arbitration under the two subsections: subsection (a) cases place the state agency on the defensive, as the direct target of the blind vendor's grievance; subsection (b) cases, in contrast, place the state agency in an offensive role, as prosecutor of a complaint (most probably on behalf of blind vendors) against a federal entity.
 
 
 33
 In addition to these differences in composition, the panel's remedial powers vary under the two subsections. Section 107d-2 provides specific direction to the arbitration panel regarding remedies in subsection (b) cases but provides no instruction at all regarding remedies in subsection (a) cases. Section 107d-2(b)(2) provides:If the panel appointed pursuant to paragraph (2) finds that the acts or practices of any such department, agency, or instrumentality are in violation of this chapter, or any regulation issued thereunder, the head of any such department, agency, or instrumentality shall cause such acts or practices to be terminated promptly and shall take such other action as may be necessary to carry out the decision of the panel.
 
 
 34
 Thus, this provision specifically grants the arbitration panel in subsection (b) cases authority to decide whether the federal entity's acts "are in violation" of the Act. The provision, however, limits the panel's authority to that decision alone: although the panel may determine that a violation is occurring and may identify the discrete acts that are in violation, the statute does not authorize the arbitration panel to order the federal entity to take any remedial action. Rather, the statute expressly places the obligation of ending the violation on the federal entity itself. The Secretary of Education[24] has no authority to order another federal entity such as the Marines to take or terminate any action. Thus, if section 107d-2 did not directly mandate that a federal entity take or terminate action according to the panel's decision, then the Act would provide for no substantive remedy in subsection (b) cases.[25]
 
 
 35
 In contrast to these express limits on the arbitration panel's power in subsection (b) cases, the section imposes no such limits on the panel in subsection (a) cases. Although we need not decide the scope of an arbitration panel's remedial powers under subsection (a), we note in passing that the Third Circuit has held that those panels' remedial powers are equivalent to the powers of an arbitration panel under the Federal Arbitration Act or the Uniform Arbitration Act. Panels under these acts have authority to award damages. See Delaware Dep't of Health & Social Servs. v. United States Dep't of Educ., 772 F.2d 1123, 1136 (3d Cir.1985). But see McNabb v. United States Dep't of Educ., 862 F.2d 681, 683 (8th Cir.1988) (per curiam) (holding that Act does not allow compensatory damages but does allow prospective damages).[26]
 
 
 36
 Whatever the exact limits of a subsection (a) panel's remedial powers, its powers are qualitatively different from those of a subsection (b) panel. The Act gives subsection (a) panels authority to impose remedies directly on the state licensing agency. The subsection (b) panel, however, under the Act's express terms, has no remedial powers whatsoever. It may determine that certain of the federal entity's acts violate the Act, but the Act leaves responsibility for remedying the violation to the federal entity itself. Thus, not only does the composition of subsection (a) panels differ from that of subsection (b) panels, so do their remedial powers. As we explain, these differences undermine the district court's interpretation of section 107d-1.
 
 
 37
 Assume for a moment that the arbitration panel in the present case could award Nash damages pursuant to subsection (a). Because a subsection (a) grievance can target only action by a state agency, the arbitration panel could award Nash damages under the subsection only if she proves that the GDHR's action in not filing a complaint injured her. Nash must therefore argue that, if the GDHR had filed a subsection (b) complaint as it should have, an arbitration panel convened under subsection (b) would have found the Marines to be in violation of the Act, and the Marines would have remedied Nash's situation as required by section 107d-2(b)(2). Because the GDHR failed to file a complaint and thereby allowed the Marines' statutory violations to continue, the GDHR is liable to Nash for damages as a result of the Marines' actions.
 
 
 38
 In order to evaluate this argument, the subsection (a) arbitration panel would look to the underlying subsection (b) dispute that the GDHR should have brought against the Marines. The panel would hold in Nash's favor only if it were to conclude that the GDHR would have won its underlying dispute with the Marines on the merits. If the panel were to conclude that the GDHR would have lost on the merits, then the Marines' actions would not have been in violation of the Act, and Nash would be entitled to no remedy in her subsection (a) action.
 
 
 39
 The structure of the Act's remedial provision, however, makes it impossible for an arbitration panel convened under subsection (a) to conduct this type of inquiry. The underlying dispute between the GDHR and the Marines would be resolved by a subsection (b) panel. Because of the differences in the compositions and remedial powers of the two kinds of arbitration panels, a subsection (a) panel will be incapable of competently evaluating an issue properly within the purview of a subsection (b) panel. As we discuss above, arbitration panels under the Act are composed in part by representatives of the parties, and not impartial judges. Cf. Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d 673, 679 (7th Cir.1983) (discussing "different weighting of impartiality and expertise in arbitration compared to adjudication"). Unlike neutral judges who can objectively evaluate the law's application to the facts, the subsection (a) arbitration panel that represents certain parties' interests cannot evaluate what decision would be reached by the hypothetical subsection (b) arbitration panel that represents different parties' interests. The interests of the representatives on the subsection (a) panel would cloud its evaluation: Nash's representative would want one outcome, and the GDHR's would want another. More importantly, the panel's perspective would be limited by the absence of interests that would be represented on the subsection (b) panel: the Marines, whose voice would carry significant weight in the hypothetical subsection (b) proceedings, would have no voice at all on the subsection (a) panel. Even the interests actually represented on both panels would be incommensurable in the two contexts: whereas the GDHR opposes Nash in the subsection (a) context, it would presumably be aligned with Nash in the subsection (b) context. For these reasons, the subsection (a) panel cannot competently evaluate the subsection (b) panel's decision.
 
 2.
 
 40
 The cause of action here at issue would also require the subsection (a) panel to predict the outcome of the case on judicial review--an inquiry that the subsection (a) panel is even less capable of undertaking. As a first stage, the subsection (a) panel's decision would have to take into account the reviewability of the subsection (b) panel's decision under the abuse-of-discretion standard set out in section 706 of the APA, 5 U.S.C. Sec. 706. The subsection (a) panel's determination that the state agency would have won the subsection (b) dispute on the merits would therefore have to include a determination of the limits of the subsection (b) panel's discretion in deciding whether a federal entity is in violation of the Act. That is, the subsection (b) panel could decide in favor of the federal entity even if that entity were arguably acting in violation of the Act. On APA review under section 706's abuse-of-discretion standard, the district court might disagree with the subsection (b) panel's decision but nevertheless uphold that decision because the panel had not abused its discretion. Thus, the subsection (a) panel would have to decide one of two things: either (1) that the subsection (b) panel would (for some reason) have ruled in the state agency's favor even though, under the circumstances, the contrary ruling would not have constituted an abuse of discretion, or (2) that the district court would have held that a decision by the subsection (b) panel in favor of the federal entity was an abuse of the panel's discretion.[27]
 
 
 41
 Nor would the inquiry end with this consideration. The subsection (a) panel would have to determine what would happen if, although the state agency won the subsection (b) dispute, the head of the federal entity refused to take any action to terminate its conduct in violation of the Act. See 20 U.S.C. Sec. 107d-2(b)(2). Of course, before the subsection (a) panel could make such a determination, the courts would have to decide whether a subsection (b) panel's decision is enforceable against a federal entity and if so, by what enforcement mechanism. The district court below never reached these questions, and as our discussion indicates, their resolution would require an even further distortion of the Act's remedial structure.
 
 
 42
 A state agency would have no express recourse under the Act if a federal entity refused to act in accordance with the subsection (b) panel's decision. As subsection (b) provides, "the decision of [the arbitration] panel shall be final and binding on the parties except as otherwise provided in this chapter." The only other applicable provision in the Act is section 107d-2, which allows for "appeal and review" of the panel's decision pursuant to the APA, 5 U.S.C. Secs. 701-06. Because the agency would not be "adversely affected or aggrieved by agency action [i.e., the Secretary of Education's action,]" as required under section 702 of the APA, see id. Sec. 702, the state agency would have no right of review under the APA. In order for the state agency to enforce the panel's decision, therefore, the courts would have to imply a cause of action under section 107d-2(b)(2), see supra note 23, for the state agency against the federal entity. In addition, blind vendors affected by the dispute at issue might attempt to intervene as necessary parties under Fed.R.Civ.P. 24. Implying such a cause of action would also force the courts to decide whether the head of the federal entity could defend his inaction by arguing in court that the arbitration panel's decision was wrong. If the head of the entity could raise such a defense, then the court would have to determine the applicable standard of review to apply to the arbitration panel's decision. Because the state agency's cause of action--implied under the statute itself--does not derive from the APA, the courts might well decide to conduct a full-blown judicial review, rather than an abuse-of-discretion review as would be required if the case arose under the APA, see 5 U.S.C. Sec. 706. By conducting a full-blown review, the district court, rather than the panel convened under subsection (b) by the Secretary, would in effect decide the substantive issues underlying the state agency's dispute with the federal entity. If the court agreed with the panel's decision, it would fashion appropriate remedies and order the head of the federal entity to act subject to the court's contempt power. By necessity, moreover, the court would retain jurisdiction to ensure compliance by the head of the entity.
 
 
 43
 Nor would that necessarily be the end of it. For example, the head of the federal entity might comply with the court's decision and, as ordered, reopen a vending facility on its property. At some time in the future, however, the federal entity might determine pursuant to section 107(b)(2) that operation of this facility "adversely affect[s] the interests of the United States" and therefore close the facility. In such a case, section 107(b) would require the federal entity to justify its decision in writing to the Secretary, "who shall determine whether such limitation is justified." Section 107(b) further provides that "[a] determination made by the Secretary pursuant to this provision shall be binding on any [federal entity] affected by such determination." The district court, however, has retained jurisdiction to ensure that the head of the federal entity complies with the court's prior decree concerning the facility at issue. Thus, the state agency, or blind vendors who may have intervened in the action, could claim that the federal entity's section 107(b) decision to close the facility is contrary to the terms of the court's decree and move the court to issue an order requiring that the head of that entity show cause why the court should not hold him in contempt for violating the decree. In response, the head of the entity could claim that as a result of a change in conditions, continued operation of the facility would "adversely affect the interests of the United States" and that under section 107(b), the federal entity must therefore close the facility. Given the case's procedural posture, the court--and not the Secretary as Congress has provided in section 107(b)--would "determine whether such limitation is justified" pursuant to section 107(b).[28] Thus, this enforcement mechanism would result in district court adjudication of substantive issues under the Act in the context of contempt proceedings--a result that is flatly inconsistent with the administrative procedure (review of the federal entity's decision by the Secretary) that Congress expressly provided in section 107(b). Congress surely could not have intended such a situation.
 
 
 44
 Even assuming that the courts could legally imply an enforcement action with these consequences, the subsection (a) panel would face the virtually impossible task of determining that, at the end of this entire procedural course (including future contempt proceedings), the state agency would prevail over the federal entity in the subsection (b) dispute. Such a task is clearly beyond the capacity of a panel convened under subsection (a) of the Act to arbitrate a dispute between a blind vendor and a state agency. Because the district court's interpretation necessarily leads to this impossible result, we hold its interpretation of the Act to be insupportable.
 
 3.
 
 45
 The district court failed to take account of the magnitude of issues implicated by its interpretation of the Act. Nor could the district court have done so. It would have had to decide a range of interpretive questions that were not properly before it concerning the reach of the Act's remedial provisions. If the district court had realized the complexities that its interpretation would present, it surely would have reconsidered its position.
 
 
 46
 In enacting and amending the Act, Congress has carefully structured a set of remedial procedures. As our analysis demonstrates, the cause of action here at issue would stretch those procedures to extremes that Congress simply could not have intended. Such a cause of action is therefore insupportable.
 
 IV.
 
 47
 For the foregoing reasons, we reject the district court's interpretation of the Act. Although a blind vendor may invoke the grievance procedures guaranteed under 20 U.S.C. Sec. 107d-1(a), the vendor has no substantive right to challenge a state licensing agency's failure to bring a complaint pursuant to 20 U.S.C. Sec. 107d-1(b).
 
 
 48
 The district court's decision is therefore REVERSED, and the award of damages to Nash is VACATED.
 
 
 49
 IT IS SO ORDERED.
 
 CLARK, Circuit Judge, dissenting:
 
 50
 The majority reaches its conclusion that Nash has no cause of action because it fails to comprehend the scope and reach of the Randolph-Sheppard Act. For example, in the opinion, p. 1492, the majority concludes, "The Secretary of Education has no authority to order another federal entity such as the Marines to take or terminate any action." This overlooks the plain language in Section 107(b) of the Act which sets forth the authority of the Secretary to enforce the mandate by Congress that blind vendors have a vested priority in operating vending facilities on federal property.
 
 
 51
 Section 107(b) of the Act provides:(b) In authorizing the operation of vending facilities on Federal property, priority shall be given to blind persons licensed by a State agency as provided in this chapter; and the Secretary, through the Commissioner, shall, after consultation with the Administrator of General Services and other heads of departments, agencies, or instrumentalities of the United States in control of the maintenance, operation, and protection of Federal property, prescribe regulations designed to assure that--
 
 
 52
 (1) the priority under this subsection is given to such licensed blind persons (including assignment of vending machine income pursuant to section 107d-3 of this title to achieve and protect such priority), and
 
 
 53
 (2) wherever feasible, one or more vending facilities are established on all Federal property to the extent that any such facility or facilities would not adversely affect the interests of the United States.
 
 
 54
 Any limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interest of the United States shall be fully justified in writing to the Secretary, who shall determine whether such limitation is justified. A determination made by the Secretary pursuant to this provision shall be binding on any department, agency, or instrumentality of the United States affected by such determination. The Secretary shall publish such determination, along with supporting documentation in the Federal Register.
 
 
 55
 20 U.S.C. Sec. 107(b).[1] In failing to understand that the Secretary of Education does have authority to require the Marines and other federal agencies to follow the law, the majority fails to understand the harm done to blind persons by inaction on the part of the state agency. In this case, the Georgia agency never notified the Secretary of Education that the Marine Corps depot in Albany was terminating a facility operated by the blind. The Secretary never had an opportunity to exercise its authority under Section 107(b) to prevent the Marines from terminating the operation of the vending facility.
 
 
 56
 Further, although the majority concedes that section 107d-1(a) provides the procedure by which Nash could seek relief from the state agency's failure to complain under section 107d-1(b), they refuse to recognize a cause of action arising under section 107d-1(b) for compensatory damages against the state agency for failure of the agency to file a complaint on behalf of the aggrieved blind vendor. In so holding, the majority concludes that the Act "allows the State agency not to file a complaint even if the agency has determined that the Federal entity at issue has failed to comply with the Act." Manuscript, at 1490.[2] Such a conclusion, as one court has noted, leads to "the anomalous result that the blind vendors would have no recourse against federal agencies." Committee of Blind Vendors v. District of Columbia, 736 F.Supp. 292, 314 (D.D.C.1990).
 
 
 57
 Finally, in concluding that the decision whether to complain on behalf of the blind vendor is completely committed to agency discretion, the majority emphasizes that section 107d-1(b), in establishing the dispute resolution process, uses the discretionary language "may" instead of "shall." 20 U.S.C. Sec. 107d-1(b) ("any ... licensing agency may file a complaint with the Secretary"). "Shall" generally connotes mandatory action when used in a statute, American Railroads v. Costle, 562 F.2d 1310, 1312 (D.C.Cir.1977), while "may" ordinarily is construed as permissive. Haig v. Agee, 453 U.S. 280, 294 n. 26, 101 S.Ct. 2766, 2775 n. 26, 69 L.Ed.2d 640 (1981). However, construction of the word "may" as discretionary "is by no means invariable, ... and can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute." United States v. Rodgers, 461 U.S. 677, 706, 103 S.Ct. 2132, 2149, 76 L.Ed.2d 236 (1983) (citations omitted). As shall be pointed out in the following summary of the legislative intent and the Act itself, the purpose of the 1974 amendments was to insure an enforcement mechanism.
 
 
 58
 A. Legislative Intent.
 
 
 59
 Congress, in enacting the Randolph-Sheppard Act amendments intended to remove "obstacles to growth" which had prevented the program from developing "in the manner and spirit in which Congress intended at the time of its enactment." Pub.L. No. 93-651, Sec. 201(1), 89 Stat. 2-7 (1974). In establishing procedures "under which fair treatment of blind vendors" would be assured, Congress intended to "permit the Randolph-Sheppard program to flourish." Id.
 
 
 60
 The Committee on Labor and Public Welfare, in its report accompanying the Randolph-Sheppard Amendments of 1974, recognized the need for more aggressive legislation to respond to the many obstacles facing the establishment of blind vending facilities on federal property. The Committee Report states:
 
 
 61
 The [General Services Administration's] priorities puts [sic] cafeteria's operations for the building employees ahead of blind vendor welfare. Commanders of Military Installations are singularly insensitive to the need to develop the program. The vast Defense establishment can report only 9 blind vendors at Air Force facilities, 17 on Army posts, and 16 at Navy bases. The parent Defense Department association at a major Federal space installation demanded that blind vendors give a portion of their income to the association--precisely the reverse of what should be taking place on Federal property. Employees at a west coast Federal building boycotted and threatened a blind vendor because he modestly increased prices on some of his items to meet inflating costs. It can be concluded from this and other evidence that there are widespread, major abuses of blind vendors and of the Randolph-Sheppard program. It is the firm resolve of the Committee that such abuses must cease.
 
 
 62
 Senate Comm. on Labor and Public Welfare, Randolph-Sheppard Act Amendments of 1974, S.Rep. No. 937, 93d Cong., 2d Sess. 10-11 (1974).
 
 
 63
 In responding to this problem, "[s]tate licensing agencies are urged to cooperate fully with the Secretary in implementing the law and regulations, and to actively seek out vending opportunities for blind licensees on all Federal property." Id. at 14. The responsibility of the state licensing agencies in administering the program also was acknowledged by a representative of the National Council of State Agencies for the Blind at Senate hearings when amendments to the Randolph-Sheppard Act were introduced:
 
 
 64
 Is not the effective representation of the interests of blind licensees a basic and essential part of the 'management services' which have for so long been regarded as the responsibility of state licensing agencies?
 
 
 65
 Randolph-Sheppard Act for the Blind Amendments of 1973: Hearings on S. 2581 Before the Subcomm. on the Handicapped of the Senate Comm. on Labor and Public Welfare, 93d Cong., 1st Sess. 85 (1973) (Statement of Charles Hoehne, General Counsel, National Council of State Agencies for the Blind).
 
 
 66
 In subsequent hearings on the 1974 amendments, the advocacy function of state licensing agencies, as a means of remedying abuses by Federal entities, was further emphasized:
 
 
 67
 States were given a powerful weapon with the provision in the 1974 amendments for States to seek Federal level arbitration when they determine that Federal property-managing agencies are not acting in accordance with the Randolph-Sheppard Act. Thus far there has been one State agency arbitration, North Carolina, and the State agency won, providing improved business opportunities for some persons in that State.
 
 
 68
 Yet, today, most of the States seem timid, or for some reason, reluctant, to exercise their new authority vis-a-vis Federal property-managing agencies. Oftentimes there is the feeling that a problem can best be solved by somebody in the Bureau for the Blind in Washington, or perhaps in an RSA regional office, but our experience is that these officials, already overburdened with diverse responsibilities, do not have at hand either the will or the specific mechanisms to deal with the problem.
 
 
 69
 Actually, the States in many ways are in a better position to serve as advocates for blind vendors, and must begin to assume the responsibility for doing so. We have had cases where States should have sought arbitration to secure vending machine income for blind vendors who are not receiving the specific portions of vending machine income to which they are entitled.
 
 
 70
 We have other instances where States have knuckled under when a Federal property-managing agency decided to put a contract for a cafeteria out to bid. The Georgia arbitration which I mentioned earlier is a very good case in point, since in large part the dispute which our blind vendor has with the Georgia licensing agency grows out of its inaction or capitulation when the Defense Department in Albany, Ga. decided to terminate its agreement with the licensing agency, putting a blind vendor out of a job, and awarding a contract to a private food service firm. This occurred in 1977, but this same Defense Department installation was pleased to claim high credit from you, Mr. Chairman, and others in 1973 when it boasted of its impressive initiatives to turn the cafeteria on the Marine base over to the blind vending program in the State.
 
 
 71
 In 1977, they took the cafeteria back, despite the fact that it had been successfully operated by the blind vendors on that base for 4 years. The cafeteria is now let to a private food service, something called the Dinner Bell.
 
 
 72
 Senator Randolph: What was the year the change was made?
 
 
 73
 Mr. Gashel: The original change was made in 1973, to give the cafeteria to the blind vending program, but then in 1977 they took it back.
 
 
 74
 We told Bob Humphreys, and we told the President, and nothing got done.
 
 
 75
 Senator Randolph: Why did not someone tell me?
 
 
 76
 Randolph-Sheppard Act for the Blind Amendments of 1974: Hearings Before the Subcomm. on the Handicapped of the Senate Comm. on Labor and Public Welfare, 96th Cong. 1st Sess. 26-27 (1979) (Statement of James Gashel, National Federation of the Blind, Chief of D.C. Office).
 
 
 77
 The refusal of the state licensing agency, in whom Congress vested sole responsibility for challenging the treatment of blind vendors by federal entities, to question the removal of Ms. Nash's vending facility by the Marine Corps directly contravenes the purpose of the Act. I do not assert that whenever a blind vendor's priority is limited, the agency must exercise its discretion to file a formal statutory complaint with the Secretary. But it must at the very least consult with the Secretary or his representatives about the adverse action taken by the federal agency. The very existence of the statutory scheme evidences congressional intent to protect the priority of the blind vendor through active agency representation in asserting the rights of the blind vendor before the Secretary. The procedural process established by Congress to protect the rights of blind vendors was that of the agency assisting the blind vendor by means of a process of protecting the priority granted by law to blind persons. Thus, having agreed to administer a congressionally created and funded program, it was incumbent upon the agency to formulate regulations governing policy and procedure and to employ those procedures to fulfill its function as advocate for the blind. This they did not do, and in so failing, the agency abused its discretion.
 
 
 78
 B. Purpose and Structure.
 
 
 79
 The provisions of the Randolph-Sheppard Act and regulations promulgated pursuant to the Act demonstrate that Congress intended to provide blind persons with substantive priority over the non-blind to operate vending facilities in federal buildings, procedural due process, and equitable handling of complaints. Congress enacted the Act to provide "blind persons with remunerative employment," to enlarge "the economic opportunities of the blind," and to stimulate "the blind to greater efforts in striving to make themselves self-supporting...." 20 U.S.C. Sec. 107(a). The Act, as amended, became effective December 7, 1974. Those amendments specifically were intended to encourage a more aggressive stance on the part of the state licensing agencies to establish priority for blind vendors on federal property and to ensure greater opportunities for the visually handicapped. See, e.g., Randolph-Sheppard Act Amendments of 1974, Pub.L. No. 93-651, Sec. 201(1), 89 Stat. 2-7 (1974). ("The Congress finds ... after review of the operation of the blind vending stand program authorized under the Randolph-Sheppard Act of June 20, 1936, that the program has not developed, and has not been sustained, in the manner and spirit in which the Congress intended at the time of its enactment, and that, in fact, the growth of the program has been inhibited by a number of external forces.").
 
 
 80
 In "ensuring the growth of the [blind vendor] program," id., Congress established a procedural scheme designed to establish priority for blind vendors on federal property. The Secretary of Education is required to "prescribe regulations designed to assure" that priority is given to licensed blind persons and, "wherever feasible, to establish blind vending facilities on Federal property." 20 U.S.C. Sec. 107(b). The Act specifically requires that "[a]ny limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interest of the United States shall be fully justified in writing to the Secretary, who shall determine whether such limitation is justified." Id.
 
 
 81
 The Act requires the state licensing agency "to cooperate with the Secretary in carrying out the purpose of this chapter." 20 U.S.C. Sec. 107b(1). The role of the agency is as liaison between the blind licensee and the Secretary, keeping the Secretary informed regarding the maintenance and growth of the vending program at federal properties. Operations in the past had not been receptive to blind vending programs. See, Pub.L. No. 93-651, Sec. 201, 89 Stat. 2-7 (1974). Additionally, Congressional findings accompanying amendments to the Act required that "at a minimum," various action "must be taken" to insure the continued vitality and expansion of the Randolph-Sheppard program, id. Sec. 201(3), including the development of "guidelines for the operation of the program by State licensing agencies" and the establishment of "administrative and judicial procedures under which fair treatment of blind vendors, State licensing agencies, and the Federal Government is assured." Id. Sec. 201(3)(B), (E). Also, in accepting the designation of licensing agency, the agency agreed "to issue such regulations, consistent with the provisions of this chapter, as may be necessary for the operation of this program." 20 U.S.C. Sec. 107b(5). Finally, section 107d-1(b) authorizes the state licensing agency to file a complaint with the Secretary if the federal entity fails or refuses to comply with the Act.
 
 
 82
 C. Abuse of Discretion by State Licensing Agency.
 
 
 83
 Virtually no action required under the Act to protect the rights of blind vendors occurred in Ms. Nash's case. Although the Act explicitly requires the state licensing agency to issue regulations necessary for the operation of the blind vending program, 20 U.S.C. Sec. 107b(5), the agency, as the majority acknowledges, "has promulgated no such rules." Majority, at 1489 n. 19. See also 34 C.F.R. Sec. 395.4 (requiring the agency to "promulgate rules and regulations"). Because the agency failed to promulgate regulations, the majority concludes, "[w]e cannot look to them as a source of standards governing the agency's exercise of discretion." Majority, at 1489 n. 19. Surely an agency, by refusing to adopt standards defining the scope of their delegated power, as required by Congress, cannot then be permitted to argue that their discretion is completely unbounded.[3]
 
 
 84
 To ensure that agency administrators observe "prescribed standards and make adjudications on the basis of merit," this court has recognized the need "to require adherence to the standards of due process." Hornsby v. Allen, 326 F.2d 605, 610 (5th Cir.1964). "[A]bsolute and uncontrolled discretion invites abuse," id., which in Ms. Nash's case began with the failure of the agency to promulgate standards governing exercise of its authority and ended with the failure of the agency to exercise its authority.
 
 
 85
 No written justification was made to the Secretary by the Marine Corps when it decided to terminate Ms. Nash's license.[4] Nor did the state agency ever request the Secretary to make a determination or to convene an arbitration panel concerning the actions of the Corps under the vending program. Absent intervention by the state licensing agency, the Secretary had no way of knowing the Marines were not complying with the Act.
 
 
 86
 The statutory scheme as established by Congress under the Randolph-Sheppard Act relies on the state licensing agencies to serve as an active and responsive representative and advocate of the blind licensee in enforcing the purpose and requirements of the Act. It is against this backdrop, requiring interaction between the agency and the Secretary, promulgation of regulations establishing agency standards for protection of blind vendor priority, and agency monitoring of the continued vitality and expansion of blind vendor facilities on federal property that section 107d-1(b) authorizes the state licensing agency, upon determining that the federal entity has failed to comply with the requirements of the Act, to file a complaint with the Secretary. In Ms. Nash's case, however, as the arbitration panel determined, the only reason the state agency gave for terminating Ms. Nash's permit to operate her vending stand in Building 2200 "was to make a contract package more attractive to an outside bidder." Nash v. Georgia Dept. of Human Resources, Case No. R-S/78-1, Arbitration Award, at 45 (Warns, Arb.) (Findings). Neither negotiations with the Marine Corps, requests for assistance from the Secretary, "nor moving forward in any other positive way was undertaken, and in violation of the Randolph-Sheppard Act, the vending stand was allowed to be removed by default." Id.
 
 
 87
 Specifically, section 107d-1(b) provides that "[w]henever any State licensing agency determines" that a federal agency has not complied with the Act, it may, in the exercise of its discretion, file a complaint against the federal agency. The section presupposes a process of "determination" by the state licensing agency when the agency exercises its discretion not to file a complaint on the blind licensee's behalf.[5] It is the blind vendor's right, pursuant to the protection provided her by the Randolph-Sheppard Act, to require her designated representative, the state licensing agency, to engage in a determinative process incident to the decision whether or not to file a complaint against the federal agency. Failure to actively inquire into the actions of the Marine Corps and to investigate the basis for Ms. Nash's complaint was a dereliction of the agency's duty under the Act and is reviewable by this court.
 
 
 88
 D. Arbitration Panel Review of Agency's Exercise of Discretion.
 
 
 89
 The majority's long discussion of the grievance procedure is unnecessary. In the second sentence of the opinion the majority states: "The district court below interpreted the statute to provide a blind vendor with an action for damages against a State licensing agency based on that agency's failure to complain when a Federal entity closed a vending stand located on property under its control." As I have demonstrated the statutory scheme obligates the state agency to complain when federal agencies wrongfully prevent blind persons from operating vending facilities on government property. The district court awarded damages to Ms. Nash for failure of the state to act. The state accepted federal funds, obligated itself to take a course of action in behalf of the blind persons it represented, and then failed to do so in Ms. Nash's case. The district court was correct in affirming the arbitration panel's award of damages.
 
 
 90
 The long hypothetical drawn by the majority with respect to how the arbitration panels interact has no relationship to the issue of the state's breach of its duty.
 
 CONCLUSION
 
 91
 The majority errs when it ignores the substantive rights accruing to blind persons under the Randolph-Sheppard Act. That law vests in blind persons a priority over all others with respect to the operation of vending stands in federal buildings. The majority then fails to understand the absolute authority of the Secretary of Education to require federal agencies to adhere to the law. Lastly, the majority fails to understand that a state which agrees under the statute to undertake a program in behalf of the blind with federal funds has an obligation to represent the blind persons' interests when a federal agency wrongfully terminates a vending program. The district court should be affirmed.
 
 
 
 *
 Honorable Kenneth L. Ryskamp, U.S. District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 Section 107(b) provides in pertinent part:
 In authorizing the operation of vending facilities on Federal property, priority shall be given to blind persons licensed by a State agency as provided in this chapter; and the Secretary [of Education], through the Commissioner [of Education], shall, after consultation with the Administrator of General Services and other heads of departments, agencies, or instrumentalities of the United States in control of the maintenance, operation, and protection of Federal property, prescribe regulations designed to assure that--
 (1) the priority under this subsection is given to such licensed blind persons ..., and
 (2) wherever feasible, one or more vending facilities are established on all Federal property to the extent that any such facility or facilities would not adversely affect the interests of the United States.
 Any limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interests of the United States shall be fully justified in writing to the Secretary, who shall determine whether such limitation is justified. A determination made by the Secretary pursuant to this provision shall be binding on any department, agency, or instrumentality of the United States affected by such determination.
 
 
 [2]
 Section 107d-1 provides:
 (a) Hearing and arbitration
 Any blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program may submit to a State licensing agency a request for a full evidentiary hearing, which shall be provided by such agency in accordance with section 107b(6) of this title. If such blind licensee is dissatisfied with any action taken or decision rendered as a result of such hearing, he may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to section 107d-2 of this title, and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter.
 (b) Noncompliance by Federal departments and agencies; complaints by State licensing agencies; arbitration
 Whenever any State licensing agency determines that any department, agency, or instrumentality of the United States that has control of the maintenance, operation, and protection of Federal property is failing to comply with the provisions of this chapter or any regulations issued thereunder ... such licensing agency may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to section 107d-2 of this title, and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter.
 20 U.S.C. Sec. 107d-1 (1988).
 
 
 [3]
 Recognizing the breadth of this provision, one participant in the hearings on the 1973 amendments to the Act stated:
 [T]he right of one individual to seek and secure binding arbitration of almost any kind of dispute with the licensing agency is without precedence in the field of human service, so far as we know, and such a right could be easily abused and consume much valuable time on the part of all parties involved over matters that may not be significant or widespread.
 Hearings on S. 2581 Before the Subcomm. on the Handicapped of the Senate Comm. on Labor and Public Welfare, 93d Cong., 1st Sess. 88 [hereinafter Hearings on S. 2581] (statement of Fred R. Tammen, Field Consultant, National Rehabilitation Association).
 
 
 [4]
 As 34 C.F.R. Sec. 395.13 states, section 107d-1(a) applies when a vendor is "dissatisfied with any State licensing agency action arising from the operation or administration of the vending facility program." (Emphasis added.)
 
 
 [5]
 Statements throughout the legislative history reflect a general understanding that the Act provides blind vendors with no direct action against federal entities. See, e.g., Hearings on S. 2581, supra note 3, at 140 (statement of the American Council of the Blind) ("We approve the arbitration provision for State licensing agencies in proposed Section 5(b) [codified at 20 U.S.C. Sec. 107d-1(b) ], but we believe that blind licensees should be included to assure successful operation of the program if a State licensing agency should fail or refuse to complain.")
 
 
 [6]
 The vendor argues that section 107d-1 expressly grants this action. She does not argue that we should imply a private right of action under section 107d-1(b) for a blind vendor directly against a federal entity. Cf. Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). We therefore do not consider this issue of implied rights of action under the Act
 
 
 [7]
 Both the Georgia Department of Human Resources and the Georgia Department of Human Resources, Division of Vocational Rehabilitation (which is the Single state agency designated under the Act), are involved in this suit. We refer to them collectively as the GDHR
 
 
 [8]
 Nash had also filed a civil suit in the United States District Court for the Northern District of Georgia against the GDHR and the Department of Defense seeking to restrain the termination of her license until after the section 107d-1(a) hearing before the GDHR. The district court, however, denied Nash's request for injunctive relief and dismissed her action for failure to exhaust administrative remedies. Nash brought an appeal to the Fifth Circuit but later dismissed it
 
 
 [9]
 The arbitration panel's decision is "subject to appeal and review as [the Department of Education's] final agency action." 20 U.S.C. Sec. 107d-2(a)
 
 
 [10]
 In so holding, the district court refused to interpret section 107d-1(b) as imposing on the State agency "a nondiscretionary duty to file a complaint whenever a licensed blind vendor so requests." Bell, 528 F.Supp. at 24
 
 
 [11]
 "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. 11. The amendment has also been construed to prohibit suits by citizens against their own States. See Hans v. Louisiana, 134 U.S. 1, 15, 10 S.Ct. 504, 507, 33 L.Ed. 842 (1890)
 
 
 [12]
 The court did not, however, enter a money judgment against the GDHR, enforceable by writ of execution. Nor did the court enter an in personam order against the GDHR, enforceable by the court's contempt power
 
 
 [13]
 The district court held that the Secretary could oppose the arbitration panel's decision, even though that decision constituted "final agency action" under section 107d-2(a). Bell, 528 F.Supp. at 22. None of the parties challenge this holding on appeal; therefore, we do not consider the issue
 
 
 [14]
 We note that the district court's decision would pose no eleventh amendment problem until the court entered a money judgment or in personam order against the GDHR, see supra note 12. Without such a judgment or order, the decision would remain merely advisory
 
 
 [15]
 See supra note 2, which quotes the section
 
 
 [16]
 See also 34 C.F.R. Sec. 395.13, quoted supra note 4, which treats section 107d-1(a) as applying when a vendor is "dissatisfied with any State licensing agency action arising from the operation or administration of the vending facility program." (Emphasis added.)
 
 
 [17]
 See supra note 2 and accompanying text
 
 
 [18]
 See supra note 2 (quoting the section's text), notes 2-4, 15-17, & accompanying text
 
 
 [19]
 A regulation under the Act does require the state agency to
 promulgate rules and regulations ... which shall be adequate to assure the effective conduct of the State's vending facility program ... and the operation of each vending facility in accordance with this part and with the requirements and conditions of each department, agency, and instrumentality in control of the maintenance, operation, and protection of Federal property....
 
 
 [34]
 C.F.R. Sec. 395.4. This regulation might arguably require the state agency to promulgate its own procedures and rules to govern its powers under section 107d-1(b). In the present case, however, the GDHR has promulgated no such rules. Thus, we cannot look to them as a source of standards governing the agency's exercise of discretion. Nor does the Secretary's regulation itself give the vendor any substantive rights. As this court has stated, "[f]or a regulation to have the force and effect of law, and thus to be the source of an affirmative legal obligation, it must be a 'substantive rule.' " Smith v. Russellville Prod. Credit Ass'n, 777 F.2d 1544, 1548 (11th Cir.1985) (quoting United States v. Harvey, 659 F.2d 62, 64 (5th Cir. Unit B Oct. 1981)). Section 395.4 is not such a substantive rule
 
 
 [20]
 See infra section C for a discussion of the interpretation's structural implications
 
 
 [21]
 See supra note 19
 
 
 [22]
 See id
 
 
 [23]
 Section 107d-2 provides in pertinent part:
 (a) Notice and hearing
 Upon receipt of a complaint filed under section 107d-1 of this title, the Secretary shall convene an ad hoc arbitration panel as provided in subsection (b) of this section. Such panel shall, in accordance with the provisions of subchapter II of chapter 5 of Title 5, give notice, conduct a hearing, and render its decision which shall be subject to appeal and review as a final agency action for purposes of chapter 7 of such Title 5.
 (b) Composition of panel; designation of chairman; termination of violations
 (1) The arbitration panel convened by the Secretary to hear grievances of blind licensees shall be composed of three members appointed as follows:
 (A) one individual designated by the State licensing agency;
 (B) one individual designated by the blind licensee; and
 (C) one individual, not employed by the State licensing agency or, where appropriate, its parent agency, who shall serve as chairman, jointly designated by the members appointed under subparagraphs (A) and (B).
 If any party fails to designate a member under subparagraph (1)(A), (B), or (C), the Secretary shall designate such member on behalf of such party.
 (2) The arbitration panel convened by the Secretary to hear complaints filed by a State licensing agency shall be composed of three members appointed as follows:
 (A) one individual, designated by the State licensing agency;
 (B) one individual, designated by the head of the Federal department, agency, or instrumentality controlling the Federal property over which the dispute arose; and
 (C) one individual, not employed by the Federal department, agency, or instrumentality controlling the Federal property over which the dispute arose, who shall serve as chairman, jointly designated by the members appointed under subparagraphs (A) and (B).
 If any party fails to designate a member under subparagraph (2)(A), (B), or (C), the Secretary shall designate such member on behalf of such party. If the panel appointed pursuant to paragraph (2) finds that the acts or practices of any such department, agency, or instrumentality are in violation of this chapter, or any regulation issued thereunder, the head of any such department, agency, or instrumentality shall cause such acts or practices to be terminated promptly and shall take such other action as may be necessary to carry out the decision of the panel.
 
 
 [24]
 The arbitration panel's decision constitutes the Department of Education's final agency action. See 20 U.S.C. Sec. 107d-2(a)
 
 
 [25]
 We discuss below whether even this direct mandate is enforceable. See infra at 1492-1494
 
 
 [26]
 We do not understand what the McNabb court means by prospective damages. A court awards compensatory damages when a party proves that he has suffered an injury, the extent of which is presently ascertainable. In such a case, the court reduces the injury to a money judgment. If the extent of the injury is not presently ascertainable--for example, the injury has not yet occurred--then the court cannot reduce the injury to a money judgment: the damages are uncertain. In that case, the court cannot yet award damages. No injury has yet occurred and the nature of any "prospective" injury is indeterminate. The damages issue must therefore be considered in future litigation after (and if) the injury in fact occurs
 
 
 [27]
 Of course, the subsection (a) panel's determination in either direction would take account of the case's disposition on subsequent appeals
 
 
 [28]
 The court could of course issue the order to show cause but stay any further proceedings pending a determination by the Secretary under section 107(b). The court, however, would still review the Secretary's determination in the context of the contempt proceeding
 
 
 [1]
 The emphasized language was not in either the 1936 or 1954 Acts
 
 
 [2]
 Interestingly, even the state licensing agency believed that its decision not to file a complaint on the blind vendor's behalf was actionable in a section 107d-1(a) proceeding and subject to review by the district court. The agency hearing officer simply concluded, in his final administrative decision, that the Georgia Department of Natural Resources did not abuse its discretion in failing to complain on Ms. Nash's behalf
 
 
 [3]
 See Morton v. Ruiz, 415 U.S. 199, 231-32, 94 S.Ct. 1055, 1072-73, 39 L.Ed.2d 270 (1974) ("The power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.... This agency power to make rules that affect substantial individual rights and obligations carries with it the responsibility not only to remain consistent with the governing legislation, ... but also to employ procedures that conform to the law."); White v. Roughton, 530 F.2d 750, 753-54 (7th Cir.1976) ("Defendant Roughton as administrator of the general assistance program has the responsibility to administer the program to ensure the fair and consistent application of eligibility requirements. Fair and consistent application of such requirements requires that Roughton establish written standards and regulations.... [D]efendant Roughton admitted that he and his staff determine eligibility based upon their own unwritten personal standards. Such procedure, vesting virtually unfettered discretion in Roughton and his staff, is clearly violative of due process.")
 
 
 [4]
 The district court correctly notes that "[i]t is undisputed that the Marine Corps did not follow the procedure outlined in section 107(b)...." Georgia Dept. of Human Resources v. Bell, 528 F.Supp. 17, 23 (N.D.Ga.1981)
 
 
 [5]
 The responsibility of the licensing agency is analogous to that of the Secretary in convening an arbitration panel. As the Senate Committee recognized, "it is expected that the Secretary will refuse to convene an arbitration panel if, in his reasoned and documented opinion, a complaint is specious or has been brought solely for the purpose of harassment." Senate Comm. on Labor and Public Welfare, Randolph-Sheppard Act Amendments of 1974, S.Rep. No. 937, 93d Cong., 2d Sess. 20 (1974) (emphasis added). The same procedure and consideration should be required of the state licensing agency