**John H. COLEMAN, Appellant,**

v.

**Jesse BROWN, Secretary of Veterans Affairs, Appellee.**

**No. 90–966.**

United States Court of Veterans Appeals.

Aug. 3, 1993.

John H. Coleman, pro se.

Robert E. Coy, Acting Gen. Counsel, Barry M. Tapp, Asst. Gen. Counsel, Andrew J. Mullen, Deputy Asst. Gen. Counsel, and Michael P. Butler, Washington, DC, were on the pleadings, for appellee.

James A. Endicott, Jr., Gen. Counsel, Norman G. Cooper, Acting Asst. Gen. Counsel, Andrew J. Mullen, Deputy Asst. Gen. Counsel, and Michael P. Butler, Washington, DC, were on the memorandum of law submitted in response to Court order dated October 5, 1992.

Roger M. Adelman and Matthew D. Anhut, Washington, DC, were on the memorandum of law as amici curiae.

Before NEBEKER, Chief Judge, and MANKIN and IVERS, Associate Judges.

IVERS, Associate Judge:

John H. Coleman (veteran) appeals from a May 22, 1990, Board of Veterans' Appeals (BVA or Board) decision which determined that he was incompetent for Department of Veterans Affairs (formerly Veterans' Administration) (VA) purposes pursuant to 38 C.F.R. § 3.353 with regard to direct payment of the current disability benefits he receives from the VA. The Secretary of Veterans Affairs (Secretary) filed a motion for summary affirmance. On October 5, 1992, the Court issued an order inviting the Secretary and amici to address certain issues. The Court has jurisdiction of the case pursuant to 38 U.S.C.A. § 7252(a) (West 1991). For the reasons set forth below, we reverse the Board's decision as legally erroneous and direct that the determination of incompetence be vacated.

## I.

The veteran served in the United States Navy from November 1965 to June 1968. R. at 1. In January 1977, the VA rated him 100% disabled for schizophrenia, paranoid type, with drug abuse and alcoholism. R. at 57. In June 1987, the veteran's 100% evaluation was confirmed and continued by a VA Regional Office (RO), and, although the rating board noted that the "vet[eran']s private physician indicates that the vet[eran] is more disturbed than ever," the veteran was deemed "competent" at that time. R. at 5. Later in the summer of 1987, the veteran was admitted to a VA Medical Center (VAMC) in Reno, Nevada, for treatment for "schizophrenia, paranoid type, chronic in acute exacerbation." R. at 6. It was noted on his discharge summary from the VAMC that Mr. Coleman "was told at the time of his discharge that should he demonstrate irresponsibility in the management of his life and funds that on his next admission [a] conservatorship will be implemented." R. at 7. In August 1987, a rating decision was issued, confirming and continuing his 100% evaluation and deeming him competent. R. at 9.

In October 1988, the veteran returned to the VAMC requesting financial assistance. R. at 11. A medical progress note dated October 18, 1988, shows that the veteran had spent his Social Security and VA checks and had no money left for food. *Id.* At first, the veteran said he had received an "unexpected light bill," but then said that he had been "doing a lot of traveling for CIA purposes at the order of a General." *Id.* The veteran's mother and father were telephoned, and "[b]oth expressed concern over [the veteran's] inability to manage his funds." R. at 12. VA progress notes state that the veteran appeared incapable of managing his funds and that he needed to have a conservator appointed to handle his finances. R. at 11–12. On October 20, 1988, the Chief of Psychiatry at the VA facility stated in a memorandum to the Chief of Medical Administration that the veteran "needs to have a conservator of his funds." R. at 10. The Chief of Psychiatry noted that the veteran "has [c]hronic [s]chizophrenia and has a severe thought disorder and severe delusions which impair his judgment and he is not able to manage his funds in his own interest." *Id.*

On November 25, 1988, the RO rendered a decision, proposing to rate the veteran incompetent. R. at 14. In December 1988, the veteran wrote to the VA, expressing disagreement with the decision and requesting a personal hearing. R. at 15. In January 1989, the VA sent the veteran a Statement of the Case (SOC) (R. at 19–20), and in June 1989, a hearing was held at the RO in Newark, New Jersey, at which the veteran and his mother testified. R. at 21–49.

The veteran testified that he was living in a room in a boarding house which he rented for $700.00 a month, noting that it was expensive because it was near the beach. R. at 41. He also testified that he spent $400.00 to $500.00 a month for food

and $50.00 a month for cigarettes. R. at 30. He stated that he paid $75.00 a month for automobile insurance and $75.00 for an outstanding credit card debt of approximately $1300.00 and that he currently had $5.00 in the bank but that he "really [doesn't] save any money." R. at 30–31, 34. His total income from Social Security and VA was about $1800.00 a month. R. at 31. The veteran acknowledged that he had problems in the past regarding overdrawn checks but stated that all of those debts were paid. R. at 39–40.

He also testified, inter alia, that while in Nevada he had run "into a problem with some old friends . . . from the Mafia" (R. at 28); that he had "many friends who have heard of [him] and know [him], . . . includ[ing] the Hursts [sic] of California" (R. at 29); that he was "the under-cover [sic] agent who is responsible for retrieving Tonia [sic] from the Cibanese [sic] Liberation Army" and that information he had given the police had "saved Patty Hurst's [sic] life" (R. at 29); and that "in 1985, a commandant of the United States Marine Corps confirmed some kills that [he] had made in Vietnam." R. at 38–39. When asked whether she thought the veteran could handle his own money, the veteran's mother stated that she thought that "this has awakened a lot of things . . ." and that she thought the veteran was "ready to sit down and seriously think about this. . . ." R. at 45.

In a letter dated July 1, 1989, a private physician did not directly comment on Mr. Coleman's competence or his ability to handle his funds, but he did state that the veteran "is actively psychotic [and] delusional" and that he had been hospitalized "several times last year." R. at 50. Upon examination of Mr. Coleman in July 1989, a VA psychiatrist noted that "paranoid, persecutory [and] grandiose thought disorder is evident" and that the veteran "suffers from severe paranoid psychosis." R. at 53–54. The psychiatrist also noted that he felt that Mr. Coleman was "not competent to handle his financial affairs at this time." R. at 54.

In August 1989, based upon the testimony of the veteran and his mother at the RO hearing, the letter from the private physician, and the report of the VA psychiatrist, the hearing officer confirmed and continued the November 25, 1988, rating board decision which proposed that the veteran was incompetent to handle his affairs. R. at 55. Subsequently, on August 17, 1989, the RO issued a rating decision deeming the veteran incompetent as of the date of the decision. R. at 56–57. A Supplemental SOC (SSOC) dated August 29, 1989, was sent to the veteran. R. at 59–61. In September 1989, the RO received a letter from the veteran accompanied by documents pertaining to the veteran's financial affairs. R. at 62–82. Among the documents was a bank statement showing charges for overdraft and insufficient funds. R. at 66.

On September 25, 1989, the RO issued a rating decision, confirming and continuing the finding of incompetency. R. at 83. In October 1989, the RO issued an SSOC (R. at 85–87), and the veteran wrote two letters expressing his disagreement with the rating board's decision. R. at 88–92. In appealing the finding of incompetency to the BVA, the veteran's representative contended that, although the veteran suffered from a serious psychiatric defect, he was capable of handling his own financial affairs. R. at 95–96. The representative noted that the only outstanding debt that the veteran had was a credit card debt of $1400.00. R. at 96. In May 1990, the BVA reviewed the evidence of record and concluded that the veteran was not competent to handle his own financial affairs. *John H. Coleman*, BVA 90–16432, at 6 (May 22, 1990). The veteran filed a timely appeal to this Court.

## II.

■ On October 5, 1992, the Court issued an order inviting the Secretary and amici to submit supplemental memoranda addressing, inter alia, whether the Board decision was a final appealable order, given the authority of the Veteran's Service Officer (VSO) under 38 C.F.R. § 3.353 (1992) to modify an incompetency determination.

Although both the Secretary and amici agree that the Board's decision is a final decision under 38 U.S.C.A. § 7266(a) (West 1991) for purposes of review by this Court, agreement by the parties alone cannot confer jurisdiction. Our inquiry into finality stemmed from the fact that a VSO might recommend that a veteran not be determined incompetent and that recommendation followed. Since the Board undertook to make a final decision rather than await a VSO action, we deem its decision to be a final appealable order, because each day that Coleman is deemed incompetent, that determination cannot be undone for those days. *See Stack v. Boyle,* 342 U.S. 1, 6–7, 72 S.Ct. 1, 4, 96 L.Ed. 3 (1951); *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 548, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949).

■ Section 3.353(a) of title 38, Code of Federal Regulations, defines mental incompetence for VA purposes as follows:

> (a) *Definition of mental incompetency.* A mentally incompetent person is one who because of injury or disease lacks the mental capacity to contract or to manage his or her own affairs, including disbursement of funds without limitation.

38 C.F.R. § 3.353(a) (1992). Subsection (b) outlines how competency determinations are conducted: The RO makes the initial determination, then the VSO is informed of the possible need for a fiduciary. The VSO is responsible for collecting information on the veteran's social, economic, and industrial adjustment, and if the VSO agrees with the incompetency determination, he or she appoints a fiduciary. If, however, the VSO disagrees with the incompetency determination, he or she forwards all evidence to the rating agency, accompanied with a statement of his or her conclusion. The RO then, in turn, reconsiders its prior decision, and, if necessary, requests reexamination.

Here, the VSO was not involved in the process. This Court has held that "[t]he BVA is not free to ignore regulations which the VA has adopted." *Schafrath v. Derwinski,* 1 Vet.App. 589, 592 (1991) (quoting *Payne v. Derwinski,* 1 Vet.App.

85, 87 (1990)); *see also* 38 U.S.C. § 7104(c) (West 1991); *Manio v. Derwinski,* 1 Vet. App. 140, 145 (1991). The Court has also noted that "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Fugere v. Derwinski,* 1 Vet.App. 103, 108 (1991) (quoting *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974)).

■ The Secretary argues that the VSO is not crucial to a competency determination, and suggests that should the RO revise its decision upon recommendation by the VSO, the claim would simply be reopened as allowed under 38 U.S.C.A. § 5108 (West 1991). Secretary's Mem. at 11. That position overlooks the valid point made by amici that "[t]he VSO is intended to play an integral role in developing evidence relating to the veteran's ability to handle his affairs. This is an affirmative obligation to develop evidence, not merely an opportunity for evaluating new evidence." Amici's Mem. at 11.

### III.

■ We note furthermore that the Board's decision lacks an adequate statement of reasons or bases for pronouncing the veteran incompetent:

> [T]he evidence of record demonstrates that [the veteran] is actively psychotic and delusional and is not competent to handle his own financial affairs. While there is some indication that he has handled some aspects of his affairs in a prudent manner, we also note that he has incurred a substantial credit card bill, and has overdrawn his bank account on a[t] least one occasion. While such items, by themselves, might not be conclusive on the issue of competency, they become far more compelling evidence of incompetency when seen in the light of his psychotic thought disorder.

*Coleman,* BVA 90–16432, at 6. Subsection (a) of 3.353, *supra,* requires that in order to declare a person incompetent, that person (1) must be mentally ill; and (2) must, as a result of that illness, lack the mental capac-

ity to manage his or her affairs, including disbursement of funds. The Board's rationale, on the other hand, effectively reads much like the following: (a) the veteran has a mental condition; (b) the veteran appears to be handling his funds adequately although he owes $1400 on a credit card and has had one dishonored check; (c) the veteran has a mental condition; (d) the veteran is incompetent. The logic here is faulty for the Board fails to demonstrate how the veteran's mental condition has rendered him incapable of managing his funds.

Accordingly, should the issue of veteran's competence come before the Board again, the Board must carefully consider the provisions of section 3.353, and craft an adequate statement of reasons or bases for its decision. Furthermore, the Board must consider the presumption of competency outlined in section 3.353(d).

The determination of incompetence being infested with legal error, the Secretary's motion for summary affirmance is denied, the May 22, 1990, decision of the BVA is REVERSED, and the Board is directed to vacate the RO's finding of incompetence. The Court is indebted to Roger M. Adelman, Esq. and Matthew D. Anhut, Esq., who, on the Court's request, submitted a most helpful and scholarly memorandum of law.